Submitted on remand from the Oregon Supreme Court March 15,
reversed and remanded September 28, petition for review denied
December 28, 2005 (339 Or 701)

Bobbie STROME,
*Respondent,*
*and*

Garth STROME,
*Appellant,*
*and*

Suzanne E. STROME,
*Respondent-below.*

99-CV-0259-MA; A111369

120 P3d 499

Russell Lipetzky filed the briefs for appellant.

Helen T. Dziuba, Melissa P. Lande, and Bryant Lovlien & Jarvis PC, filed the brief for respondent.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

This case is before us on remand from the Oregon Supreme Court, *Strome and Strome*, 337 Or 555, 101 P3d 809 (2004), with instructions to reconsider it in light of the court's decision in *O'Donnell-Lamont and Lamont*, 337 Or 86, 91 P3d 721 (2004), *cert den*, 543 US 1050, 125 S Ct 867, 160 L Ed 2d 770 (2005). In our original decision, we applied the 1997 version of Oregon's third-party custody statute, ORS 109.119, and determined that paternal grandmother had not overcome the statutory presumption that favors legal parents in custody disputes.[1] Accordingly, we reversed the trial court's award of custody to grandmother. *Strome and Strome*, 185 Or App 525, 60 P3d 1158 (2003).

Grandmother petitioned for review. While grandmother's petition for review was pending, the Supreme Court decided *O'Donnell-Lamont* and held that the 2001 legislative amendments to ORS 109.119 applied retroactively to custody cases filed *before*, on, or after July 31, 2001.[2] 337 Or at 102. The amended version of the statute, which sets forth a new framework for analyzing third-party custody cases, provides, in part:

"(2)(a)  In any proceeding under this section, there is a presumption that the legal parent acts in the best interest of the child.

"* * * * *

"(3)(a)  If the court determines that a child-parent relationship exists and if the court determines that the presumption described in subsection (2)(a) of this section has

---

[1] Relying on this court's decision in *O'Donnell-Lamont*, 184 Or App 249, 56 P3d 929 (2002), we held that, under the 1997 version of the statute, the presumption in favor of the legal parent, father, could be overcome only by a showing that father "cannot or will not provide adequate love and care or that the children will face an undue risk of physical or psychological harm in [father's] custody." *Strome and Strome*, 185 Or App 525, 533, 60 P3d 1158 (2003) (brackets in original).

[2] After our original decision in this case, we had modified on reconsideration our decision in *O'Donnell-Lamont* and held that the 2001 amendments were retroactive. 187 Or App 14, 67 P3d 939 (2003). The Supreme court agreed with that portion of our modified opinion. ORS 109.119 was amended again in 2003, but those amendments do not affect our analysis. *See* Or Laws 2003, ch 143, §§ 1-2; ch 231, §§ 4-5; ch 576, §§ 138-39. All subsequent references to ORS 109.119 are to the 2001 version, unless otherwise noted.

been rebutted by a preponderance of the evidence, the court shall grant custody * * * to the person having the child-parent relationship, if to do so is in the best interest of the child. * * *

"* * * * *

"(4)(b)   In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody, guardianship or other rights over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A)   The legal parent is unwilling or unable to care adequately for the child;

"(B)   The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C)   Circumstances detrimental to the child exist if relief is denied;

"(D)   The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E)   The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

In *O'Donnell-Lamont*, the Supreme Court further held that, in specific cases, "the weight to be given to each of the five statutory factors, to the evidence supporting those factors, and to other relevant evidence, will vary." 337 Or at 108. The focus of the statute "is not on whether one or more of the statutory factors are present, but on whether the evidence as a whole is sufficient to overcome the presumption that the parent acts in the best interest of the child." *Id.* at 109.

On the basis of its holding in *O'Donnell-Lamont*, the court granted grandmother's petition for review and remanded this case for reconsideration. We now reexamine *de novo* the evidence in light of the 2001 amendments to ORS 109.119 and the guidance provided in *O'Donnell-Lamont*. On remand, we again reverse the trial court's custody award.

## I. FACTS

We adhere to the summary of facts set forth in our original decision. *Strome*, 185 Or App at 527-32. Rather than repeat that entire summary here, we will recite those facts most pertinent to our discussion and will supplement those facts as necessary in our discussion of the applicable legal standards.[3]

Father and mother, his former wife, have three daughters, B, E, and H.[4] The children were 10, 8, and 6 years old at the time of the June 2000 custody proceeding. In 1995, father and mother petitioned to dissolve their marriage. At the time of the dissolution, the children were living with mother in Bend, while father was living in Portland. During the dissolution proceedings, grandmother and father learned that mother had exposed the children, particularly B, to sexual and other abuse while they were in her care. With grandmother's help, father obtained temporary custody of the children and moved them and himself to grandmother's home in Bend, where they stayed until 1999.

Before he returned to Bend, father was working at a bar in Portland. He had also engaged in prostitution for money and drugs. When father first moved back to Bend in 1995, he had only limited involvement with the children. He had difficulty controlling his temper with the children, and, when he was angry, he yelled at them and called them obscene names. He spent most of his time working on the computer, much of it at night, and then slept during a large part of the day. At that time, grandmother was the primary financial support for father and children and played a more significant role in the children's lives than did father.

---

[3] We have reviewed the record *de novo* and have determined that it is unnecessary to remand for a new evidentiary hearing. We conclude, as we did in *Wilson and Wilson*, 199 Or App 242, 249, 110 P3d 1106 (2005), that the 2001 amendments, at least as they are pertinent to this case, are not appreciably different from the relevant statutory factors applied in the trial court. We also note that, with respect to application of the 2001 amendments, grandmother represented that "[t]here would be no benefit to a remand to the trial court."

[4] While this case was pending on appeal, the parties signed a stipulated judgment resolving the custody of the oldest child, B. Accordingly, only the custody of father's other two children, E and H, is at issue.

In the first years that he lived in Bend, father also used drugs occasionally, and, in a few instances, he was an escort for older, wealthier men. Then in late 1997, father met Michael Chism, a truck driver who lived in Roseburg and who is about 15 years older than father. Chism has two children, one who was in college and another who is approximately E's age. Father and Chism developed a relationship and began visiting at each other's homes. Father occasionally took the children with him to Roseburg. Chism is an alcoholic, and, at times, father's relationship with him involved excessive drinking. However, father also saw Chism as a mature role model, particularly with regard to Chism's responsibility toward his own children. In late 1998 or early 1999, father decided to move to Chism's house in Roseburg and to take the children with him. At about the same time, a confrontation with B led him to realize that his yelling and swearing at the children was inappropriate and damaging. According to father and to the children, he later stopped that kind of conduct. At the time of the hearing, there was no evidence that father's outbursts continued after that confrontation.

Father moved the children into Chism's house in Roseburg at the end of May 1999, shortly before the end of the school year, and enrolled them in Roseburg schools. In early June, grandmother filed this petition and obtained a temporary custody order; the police took the children from their Roseburg schools and returned them to Bend. Father then regained custody in August and continued to exercise custody until the time of the hearing in June 2000, subject to grandmother's frequent visitation with the children.

In contrast to his conduct during his early years in Bend, father's parenting of the children in Roseburg in the 10 months before the hearing was exemplary, and the overwhelming evidence is that the children thrived in their home in Roseburg. Father obtained a job that allowed him flexibility to be with the children and to participate actively in all aspects of their lives. He got them ready for school every morning and walked the younger girls to their school a few blocks away. B's school was across the street, and she usually went by herself. He picked up the two older girls at the end of the school day. For much of the year, Chism picked up H

when he was in town. However, shortly before the June 2000 custody proceedings, Chism went on an alcoholic binge and was incapacitated for several days. Thereafter, he entered a rehabilitation program, and the daycare provider assumed the task of picking up H.

In father's home, each of the children had appropriate chores. Father helped them with any homework. He was appropriately warm and affectionate with them. In the evening, they read and watched television. Father took care to avoid exposing them to inappropriate programs and videos.

All of the children did well in school while they were in Roseburg. Their teachers uniformly described them as bright and articulate and said that they made friends easily. No teacher indicated that the children showed signs of being at risk or in need of counseling. B's school counselor testified that the best thing for B to do to overcome any problems from her previous experiences was to get on with her life and, in the counselor's opinion, B was succeeding in that endeavor.

Also, two experts conducted studies related to the custody issue. They had different purposes for their studies. Dr. Catherine Bolstad, a psychologist, conducted a custody study in which her focus was a comparison of grandmother and father as potential custodial parents. Her primary purpose was to determine the best interests of the children, and she ultimately recommended that grandmother receive custody. In contrast, Joseph Mazza, a licensed clinical social worker, conducted a home study and parenting evaluation of father to determine the current conditions and circumstances of the family. He did not attempt to compare father's home with grandmother's but, rather, to evaluate father's home in light of his experience with many other homes and his knowledge of general theory about parenting. Mazza's focus is more relevant to the applicable legal standards than is Bolstad's, and, as a result, his observations and opinions generally are more helpful in deciding this case than are Bolstad's.

## II.   APPLICATION OF ORS 109.119

The issue on remand is whether grandmother produced sufficient evidence to rebut the presumption under

ORS 109.119 that father acts in the best interest of his children.[5] As discussed above, ORS 109.119(4)(b) lists five factors that a court may consider in determining whether a nonparent has rebutted, by a preponderance of the evidence, that presumption:

> "(A) The legal parent is unwilling or unable to care adequately for the child;

> "(B) The petitioner or intervenor is or recently has been the child's primary caretaker;

> "(C) Circumstances detrimental to the child exist if relief is denied;

> "(D) The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

> "(E) The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

As the Supreme Court noted in *O'Donnell-Lamont*, the difficulty in construing the statute "is to determine how demanding the burden is on the nonparent to rebut the parental presumption." 337 Or at 106. The court, however, declined to describe the burden as "easy" or "heavy," or to place any "further adjectival gloss on the burden that an otherwise qualified nonparent must meet * * *." *Id.* Rather, the court offered two "observations respecting the operation of the statute, in the hope that they will assist courts in applying the statute in future cases." *Id.* First, the legislature used the "preponderance of the evidence" standard rather than the more demanding "clear and convincing evidence" standard. *Id.* Second, the legislature identified five relevant but nonexclusive factors that may be considered in determining whether the presumption in favor of the legal parent has been rebutted. *Id.* at

---

[5] ORS 109.119 sets forth a three-part test for determining third-party custody. The first step is to determine whether the nonparent has established a child-parent relationship with the children who are the subject of the custody proceedings. In this case, father cannot credibly dispute that grandmother has a child-parent relationship with his children. The second step is to determine whether the nonparent has rebutted the presumption that the legal parent acts in the best interest of his or her children. Because we find that grandmother has failed to rebut that statutory presumption, we do not reach the third step, which is to determine whether an award of custody to the nonparent is in the best interest of the children.

107. "By stating that those factors are nonexclusive and by including, as relevant factors, [(B) and (D)], the legislature demonstrated that the parental presumption can be rebutted *without* a showing that the parent will harm the child or is unable to care for the child." *Id.* (Emphasis in original.) Ultimately, the court held, "[t]he statutory touchstone is whether the evidence at trial overcomes the presumption that a legal parent acts in the best interest of the child, not whether the evidence supports one, two, or all five of the nonexclusive factors identified in ORS 109.119(4)(b)." *Id.* at 108. With that guidance, we turn to an analysis of the statutory factors in this case.

A. *Findings as to the rebuttal factors*

The first rebuttal factor is whether the "legal parent is unwilling or unable to care adequately for the child." ORS 109.119(4)(b)(A). "[C]onsideration of this factor does not allow the court to substitute its judgment for that of a parent in determining that the nonparent is *better* able to care for the child." *O'Donnell-Lamont*, 337 Or at 110 (emphasis in original). The legislature's use of the word "adequately" suggests that the parent "must have the willingness and ability to provide something more than a bare subsistence level of care for the child, but that it would be inappropriate to compare a parent's 'adequate' care with a nonparent's 'more than adequate' care in considering this factor." *Id.*

Although the record is replete with evidence of father's past inadequacies as a parent, it does not support a finding that, at the time of the hearing, father was "unwilling or unable to care adequately for the child." By all accounts, father's parenting in the 10 months before the hearing was exemplary, and the evidence demonstrates that the children thrived during their time in Roseburg. Father obtained a job that allowed him the flexibility to be with his children and to participate in school activities. The children had appropriate chores at home, and father assisted them with their schoolwork. The children's teachers in Roseburg uniformly praised them as bright, articulate, and well-behaved.

We next consider whether grandmother has demonstrated that she "is or recently has been the child[ren's] primary caretaker." ORS 109.119(4)(b)(B). "This factor focuses

on the interest in continuity of caregiving and the relationship between the child and the nonparent seeking custody." *O'Donnell-Lamont*, 337 Or at 111. The children lived with their grandmother in Bend from 1995 until 1999, and during that time grandmother was the chief financial provider for the children. At least in the first years in Bend, grandmother played a more significant role than father and acted as their primary caretaker. However, in the 10 months before the hearing, father assumed the role of primary caretaker. Accordingly, we find that grandmother has demonstrated the existence of this factor but that it is offset by evidence that father was the primary caretaker in the 10 months prior to the hearing.

Third, we consider whether "[c]ircumstances detrimental to the child[ren] exist" if grandmother is denied custody. ORS 109.119(4)(b)(C). The phrase "[c]ircumstances detrimental to the child[ren]" is further defined by statute as including, but not being limited to, "circumstances that may cause psychological, emotional or physical harm to a child." ORS 109.119(8)(b). Significantly, the circumstances must pose a serious *present* risk of such harm; otherwise, the presumption "would be almost meaningless if it could be overcome by evidence that the circumstances of living with a legal parent '*may* cause psychological, emotional, or physical harm to a child.'" *O'Donnell-Lamont*, 337 Or at 112 (emphasis in original).

As we stated in our original decision, there are a number of circumstances in this case that concern us about father's parenting abilities. Most significantly, father has a history of drug and alcohol abuse, and his partner, Chism, continued to struggle with substance abuse up to the time of the hearing. However, father testified that he now enforces a "zero tolerance" policy for drugs in the house, and there is no evidence that the children were exposed to drug use during their time in Roseburg. With respect to Chism's struggles with alcohol, father insisted that Chism seek help (which Chism did), and father no longer relied on Chism for daycare after his relapse. In the absence of evidence that father's drug use has continued into the present, or that Chism's behavior is a *present* risk to the children, we cannot conclude that father's past substance abuse poses a serious present risk of

psychological, emotional, or physical harm. *See Dennis and Dennis*, 199 Or App 90, 100-02, 110 P3d 607 (2005) (where father had committed domestic violence toward mother and had used illegal drugs, but made a "great effort to change his past behaviors," those past behaviors do not demonstrate the existence of circumstances detrimental to the children); *Sears v. Sears*, 198 Or App 377, 381-82, 108 P3d 639, *rev den*, 339 Or 156 (2005) (grandparents' concerns that mother had used alcohol and marijuana, had lived in unsanitary conditions, did not attend to child's rash in the past, and in other nonspecific ways did not protect child's safety in the past, did not establish a *present* risk of psychological, emotional, or physical harm to child).[6]

We also are troubled by father's past difficulties controlling his temper with the children and his use of obscene and abusive language toward them. Yet the uncontroverted evidence establishes that father's yelling and swearing at the children stopped in late 1998 or early 1999 as the result of a confrontation with B. Again, considering father's most recent behavior and his willingness to acknowledge the inappropriateness of his past actions, we do not find that there exists a serious present risk that father will yell and swear at the children. *Cf. O'Donnell-Lamont*, 337 Or at 113 (finding present risk of harm based, in part, on the father's difficulty controlling his anger where father "was unable to acknowledge or identify a single possible shortcoming that he might have as a parent").

The trial court expressed concern that father did not appropriately value the children's continued close relationship with grandmother. There is evidence that father intends to reduce grandmother's role in the children's lives. He testified that he believes that the visitation "could be scaled down as far as what was mandatory * * *." Father expressed a desire to get to a point where he and his children are "just like everybody else" and are making their own decisions about how often the children see their grandmother. He has not,

---

[6] We do not intend to suggest that past conduct cannot give rise to or serve as evidence of present risks. Rather, based on the evidence in this record, we find that father's more recent conduct is more probative regarding father's willingness and ability to act in the best interest of the children.

however, proposed to eliminate grandmother's contact with the children; rather, he expressed a willingness to let the children decide how often they wanted to see their grandmother, and testified that what would be "best for the girls is continued contact with their grandmother and extended family—my family." Although there is a risk that father will sabotage a future relationship between grandmother and the children, we believe, based on the evidence before us, that the risk is speculative.

In her custody recommendation, Bolstad identified a number of additional bases for her conclusion that grandmother should receive custody, including her opinion that father does not set limits and boundaries for the children and that father was less willing to provide counseling to the children than was grandmother. On our *de novo* review of the evidence, these bases do not sufficiently demonstrate a serious present risk of psychological, emotional, or physical harm to the children. Mazza, based on his home visits, testified that father did in fact set boundaries with the children, including limitations on bed times, bath times, meals, chores, homework, television and video content, and appropriate attire. Further, the children's teachers in Roseburg testified that the children were dressed appropriately for and behaved appropriately at school. That evidence does not permit a finding that father failed to set appropriate boundaries or that the boundaries he sets pose a serious present risk to his children.[7]

Similarly, although grandmother and Bolstad ultimately may be correct that the children would benefit from counseling, on this record, we cannot find that father's refusal to encourage his children to attend counseling is evidence that he fails to act in their best interest. Mazza testified that he would be "cautious about applying counseling automatically here," and that he did not see signs in the children that would indicate a present need for counseling. The children's school counselor also testified that the children did

---

[7] Even if we were to find that grandmother set *better* boundaries than father—an assumption at the core of Bolstad's report—such a finding would not demonstrate that father's custody posed a serious present risk of psychological, emotional, or physical harm to the children.

not need counseling. Considering that testimony, we cannot conclude that father's position on counseling creates a serious present risk of harm to the children. For this reason, and those stated above, grandmother has not demonstrated that "[c]ircumstances detrimental to the child[ren] exist if relief is denied." ORS 109.119(4)(b)(C).[8]

The fourth rebuttal factor is whether "[t]he legal parent has fostered, encouraged or consented to the relationship between the child[ren] and the petitioner or intervenor." ORS 109.119(4)(b)(D). Grandmother unquestionably has demonstrated this rebuttal factor. Because of father's abdication of his role as a parent, grandmother was required to assume that role. Until 1999, father lived with grandmother and relied on her to provide support for his children. Father's own choices in Portland and during much of his time in Bend—many of which demonstrated utter lack of concern for the best interest of his children—produced an unusually close relationship between grandmother and his children.

The fifth rebuttal factor is whether "[t]he legal parent has unreasonably denied or limited contact between the child[ren] and the petitioner or intervenor." Father's decision to move the children from Bend to Roseburg was motivated, at least in part, by a desire to limit grandmother's contact with the children. Father testified that "part of why I moved was I would be the central person and know that I was—knew exactly what was going on in their lives or closer than I could have before." While the timing of the move could have been better, we do not find that the fact of the move itself was unreasonable, particularly in light of the children's success in Roseburg.

Father further admits that he initially told grandmother that she would not be able to see the children for a period of time after the move because he did not know how long grandmother would "stay angry." However, the evidence

---

[8] Grandmother's inability to demonstrate that father is unwilling or unable to adequately care for the children, or that any serious present risk to the children exists if she is denied custody, is not fatal to grandmother's case. *O'Donnell-Lamont*, 337 Or at 109. Accordingly, we review the remaining statutory factors to determine whether, based on the evidence as a whole, grandmother has rebutted the presumption in favor of father.

suggests that grandmother had immediate telephone contact with the children after the move, and there is no indication that father ever actually denied grandmother an opportunity to see the children. Nor is there evidence that father unreasonably denied or limited grandmother's contact with the children during the 10 months preceding the custody hearing.[9] Thus, we find that grandmother has demonstrated this factor with respect to the suddenness of father's move to Roseburg, but do not give it significant weight considering the totality of the relationship between father and grandmother and the success of the children in Roseburg.[10]

B.  *Determination whether presumption has been rebutted*

■      Upon reconsidering the evidence as a whole in light of the Supreme Court's decision in *O'Donnell-Lamont*, we conclude that grandmother has not rebutted, by a preponderance of the evidence, the statutory presumption that father acts in the best interest of his children. Grandmother failed to demonstrate that, at the time of the hearing, father was unwilling or unable to adequately care for his children, or that father's custody of the children would pose a serious present risk of psychological, emotional, or physical harm to them. Grandmother demonstrated that father consented to her close relationship with the children, and that by moving the children to Roseburg, he necessarily interfered with that relationship. However, we find that, on this record, those factors are insufficient to demonstrate that father does not act in the children's best interest. The evidence must be considered as a whole, and in light of the fact that father's parenting of the children in the 10 months preceding the hearing was exemplary. And when the evidence is considered as a

---

[9] By contrast, grandmother did not permit father to have telephone conversations with the children unless the conversations were tape recorded or took place on speaker phone with someone else present.

[10] The trial court found that, "when we look at who is going to foster the relationship with the other parent, it is absolutely overwhelming [grandmother] is going to do it and that [father] is not." We do not agree with the trial court's characterization of the evidence on that point. Grandmother placed far more restrictions on father's interactions with the children while they were in her custody than father placed on her visitation. In any event, this rebuttal factor does not focus on whether father will *foster* a relationship between grandmother and child, but on whether father has unreasonably denied or limited contact.

whole, grandmother's evidence does not rebut the presumption (and father's evidence) that he puts the interests of the children ahead of his own.

While we recognize that appellate courts necessarily must review a record at a given point in time, we also understand that five years have passed since this case was decided in the trial court. During the pendency of appeal, the children have lived with their grandmother. Under these circumstances, we conclude that father is entitled to custody after a period of transition designed to ensure that the children's needs are best met. *See Dennis*, 199 Or App at 104. Accordingly, we remand the case to the trial court to establish an appropriate plan to transition the children to father's custody that includes ample contact between the children and grandmother.

Reversed and remanded.