Argued and submitted September 5, 2013, affirmed August 27, 2014

In the Matter of E. K. K.,
a Minor Child.

Rachel Gayle KLEINSASSER,
*Petitioner-Respondent,*
*and*

Megan Ann LOPES,
*Respondent-Appellant.*

Jackson County Circuit Court
105739D9; A149733

333 P3d 1239

George W. Kelly argued the cause and filed the briefs for appellant.

Clayton C. Patrick argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

This is a child custody proceeding brought by stepmother against mother in the wake of the illness and death of the child's father. When his father died, the child, E, was seven years old and had lived with his father and stepmother for four years. Because stepmother had a parental relationship with E, the trial court was called on to decide whether stepmother had rebutted the presumption provided in ORS 109.119(2)(a) that mother, the legal parent, "acts in the best interest of the child." The trial court concluded that stepmother had rebutted the presumption and awarded both temporary and final custody of E to stepmother in 2011, with parenting time for mother. Mother appeals the judgment, assigning error to the trial court's denial of her motions to dismiss for insufficient evidence under ORCP 54 B(2) and to the court's award of both temporary and final custody to stepmother. We conclude that the record supports the trial court's findings and its resultant conclusions, and we affirm.

Mother asks us to exercise our discretion to review *de novo*, under ORS 19.415(3)(b), to correct findings made by the trial court that mother asserts are unsupported by the record. We will exercise our discretion to take *de novo* review only in exceptional cases. ORAP 5.40(8)(c). The trial court made sufficient findings for our review and pointed to testimony in the record on which it relied. We thus decline to engage in *de novo* review. The parties, however, do not provide us with guidance on our applicable standard of review should we decline to review *de novo* a trial court's determination of whether the presumption in ORS 109.119(2)(a) has been rebutted—a precise question we have not previously addressed. To answer that question, we review briefly the task a trial court must undertake under ORS 109.119,[1]

---

[1] ORS 109.119 provides, in part:

"(1) Except as otherwise provided in subsection (9) of this section, any person, including but not limited to a related or nonrelated foster parent, stepparent, grandparent or relative by blood or marriage, who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child may petition or file a motion for intervention with the court having jurisdiction over the custody, placement or guardianship of that child, or if no such proceedings are pending, may petition the court for the county in which the child resides, for an order providing for relief under subsection (3) of this section.

which governs custody disputes between a legal parent, such as mother, and a third party, such as stepmother.

Under that statute, "only persons who have demonstrated a child-parent relationship with the child have the right to seek custody." *O'Donnell-Lamont and Lamont*, 337 Or 86, 103, 91 P3d 721 (2004), *cert den*, 543 US 1050 (2005). Here, the parties stipulated below, and the trial court independently found, that stepmother had a child-parent relationship with E, and mother does not dispute that finding on appeal.

Once a child-parent relationship is established, the Oregon Supreme Court has described the roadmap that ORS 109.119 provides as follows:

"In such a custody proceeding, the legal parent is presumed to act in the best interest of the child. ORS 109.119(2)(a). That presumption can be rebutted, however, by a preponderance of the evidence, and the statute identifies five nonexclusive factors that the court may consider in

"(2)(a) In any proceeding under this section, there is a presumption that the legal parent acts in the best interest of the child.

"* * * * *

"(3)(a) If the court determines that a child-parent relationship exists and if the court determines that the presumption described in subsection (2)(a) of this section has been rebutted by a preponderance of the evidence, the court shall grant custody, guardianship, right of visitation or other right to the person having the child-parent relationship, if to do so is in the best interest of the child. The court may determine temporary custody of the child or temporary visitation rights under this paragraph pending a final order.

"* * * * *

"(4) * * * * *

"(b) In deciding whether the presumption described in subsection (2)(a) of this section has been rebutted and whether to award custody, guardianship or other rights over the objection of the legal parent, the court may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A) The legal parent is unwilling or unable to care adequately for the child;

"(B) The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C) Circumstances detrimental to the child exist if relief is denied;

"(D) The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E) The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

> determining whether the presumption has been rebutted (rebuttal factors). ORS 109.119(3), (4)(b). Finally, the statute provides that, if the evidence rebuts the presumption in favor of the legal parent, the court shall award custody to the person having the child-parent relationship with the child, but only if to do so is in the best interests of the child. ORS 109.119(3)(a)."

*O'Donnell-Lamont*, 337 Or at 103-04.

In determining whether the presumption that the legal parent acts in the best interest of the child is rebutted by a preponderance of the evidence, the court's focus "is not on whether one or more of the statutory factors are present, but on whether the evidence as a whole is sufficient to overcome the presumption that the parent acts in the best interest of the child." *Id.* at 109. That determination is for a court to make, sitting as the trier of fact. *See id.* at 107 (the legislature "left to the courts as triers of fact the task of deciding whether the nonparents had made that showing in any particular case"); *id.* at 108 ("In specific cases, the weight to be given to each of the five statutory factors, to the evidence supporting those factors, and to other relevant evidence, will vary. The statutory touchstone is whether the evidence at trial overcomes the presumption * * *."). That statutorily prescribed fact determination is analogous to the one a trial court must make in the context of a juvenile dependency proceeding. *See Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013). Accordingly, unless we exercise our discretion to take review *de novo*, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Id.* If the record was legally sufficient to permit the trial court to determine that the statutory presumption was rebutted, we then must determine whether the trial court abused its discretion in awarding custody based on the best interest of the child. *Underwood and Mallory*, 255 Or App 183, 193, 297 P3d 508 (2013) ("We review a trial court's determination of the best interests of a child for abuse of discretion.").

With that background in mind, we turn to the facts of this case.

# I. FACTS

## A. *Circumstances leading to the custody dispute*

E was born in March 2003. Mother is E's biological mother. E's biological father died on November 12, 2010, while E was living with father and stepmother. Father's death precipitated this custody action between mother and stepmother.

When E was born, mother and father were unmarried but living together. Because of father's job, mother provided most of E's caregiving while they lived together. After mother and father separated, E continued to live with mother until June 2006, when E was three years old. At that time, mother left E with father so that she could travel, including to Guatemala. In November 2006, father and stepmother began living together, and they married in May 2009. On mother's return to Ashland, Oregon in February 2007, E continued to live with father and stepmother in Medford. Mother never expressed any objection to E living in the household with stepmother and, based on what she knew, believed that stepmother was a good stepparent for E. Stepmother and father also had a child together, who was born in 2010, a few months before father's death.

Throughout 2007, mother moved in and out of southern Oregon and would visit with E for a weekend or a day when she was in Medford. In November 2007, mother and father entered into a formal parenting plan. They stipulated that E would live with father, who would have "decision-making authority on major decisions, after consulting with [mother]." They further agreed that mother would have parenting time.

Mother did engage in some parenting time with E when she was in southern Oregon; however, from the summer of 2008, up until the day of father's death, November 12, 2010, mother travelled extensively and moved to several different residences, both in and outside of Oregon. When she was in southern Oregon, it was usually for a few days to a week, with the exception of one period of a few months at the end of 2009. Mother's primary reasons for frequently travelling and moving were pleasure and volunteer work.

However, mother claimed that her absences between June 2008 and September 2009 were because she could not find a job in the area, so she took a job that required her to travel to several different states.

From January 2009 to father's death, mother had exercised 36 of her total 227 allotted overnights of parenting time. From January 2010 to May 2010, mother only spent nine nights with E. From May 2010 to November 2010, mother did not see E at all. Mother testified that, when she was away, she would send E photos and letters, and she would call E. Mother wanted E to travel with her in an arrangement of switching between her and father every three months because that arrangement "would have really been ideal for [mother]."

Father was diagnosed with cancer and, in October 2010, quickly became ill. He died shortly thereafter, on November 12, 2010. In his will, father had designated stepmother as the person he desired to be E's guardian. In late October, mother learned of father's illness, and on November 12, 2010, the same date as father's death, she arrived back in town and insisted that E spend the weekend with her. Stepmother allowed E to spend the weekend with mother, and E returned to stepmother's residence on Sunday evening.

The next day, three days after father's death, mother attempted to pick E up from school without notifying stepmother. When the school would not release E to her, mother went to stepmother's house and informed stepmother that she had called the police and that she would involve the police if stepmother did not agree to let E go with her. Mother told stepmother that, because father had died, stepmother was no longer a part of E's life and E was going to come live with her. Stepmother did not agree to let E leave with mother, so mother had the police come to the house, who informed stepmother that father's will was not sufficient to establish custody of E. Mother left with E for the week, but agreed to return him for the weekend so that he could attend father's memorial service. Because of mother's actions, stepmother obtained a temporary protective order of restraint (*status quo* order), restraining the parties from

changing E's residence or parenting time, pending resolution of stepmother's petition for custody.

Since November 2010, mother has lived in Ashland with her boyfriend, Brennan, whom she met in 2008, and they both have obtained local employment. They also have a child together, who was born just before the final hearing in this matter in April 2011. E and both of his half-siblings are close.

B. *Temporary custody hearing*

Because stepmother's petition was brought under ORS 109.119, which governs awards of custody to a third party who is not a legal parent, mother insisted that entry of the *status quo* order was not sufficient to determine who should have temporary custody of E. As a result, the trial court held two hearings in this matter, one in January 2011, to determine temporary custody of E, and a second hearing in April 2011 to determine final custody of E, but which only included new evidence of matters that had occurred between January and April 2011.

At the January hearing, witnesses testified to the above facts. In addition, E's grief counselor, Leavitt, testified that, for his grief recovery, E needed to have everything in his life stay the same as much as possible. That is so, in Leavitt's opinion, because, for a child who has lost a parent, any changes are additional losses, and "if there's more losses then the risk is higher for depression." Leavitt recommended that E remain living with stepmother and attend his current school and that any transition be slow because it would be detrimental for E to lose his stepmother and sibling from his daily routine.

Mother had wanted to obtain custody of E immediately after father's death and transfer him to school in Ashland, because she believed that that would be beneficial for E. Mother testified that she did not believe her actions in seeking immediate custody of E were detrimental to E because she was not planning to cut off his contact with stepmother. By the time of the first evidentiary hearing in January 2011, mother had agreed that a slower transition at spring break would be better for E, and that she would

be open to a transition at the end of the school year if she were advised that that was better. Mother also had several witnesses testify about her interactions with E. All of them testified that mother and E appeared bonded and had appropriate and adequate interactions and that mother provided adequate supervision.

At the close of stepmother's case, mother moved for judgment in her favor and dismissal under ORCP 54 B, which the trial court denied. At the close of the hearing, the trial court granted temporary custody to stepmother under ORS 109.119. With regard to rebutting the presumption that mother acts in the best interest of E, ORS 109.119(2)(a), the trial court found that mother sought to act in her own interest only and not that of E in seeking to move E to Ashland to a new school and a home unknown to him. The trial court placed significant weight on the actions mother had taken, after having been gone for a year, to involve the police in removing E from stepmother's custody a few days after father's death. The trial court further found that there was no evidence of mother's current parenting skills because she had been absent from E's life for so long. The trial court then established a temporary parenting-time schedule for mother of every other weekend and Wednesdays of the off week.

C.  *Final custody hearing*

At the April 2011 final custody hearing, witnesses testified about occurrences during the preceding four months. Leavitt testified that E was "elated and relieved" after the temporary custody hearing because he was scared that he was going to have to move. However, she also testified that E was angry and "shutting down" from grief and stress from the relationship between mother and stepmother. Leavitt opined that E was at risk for depression and that it would be detrimental to E to change his living situation because that risk would increase. However, when Leavitt spoke with mother before the hearing, mother said that she "doesn't agree that it takes time for [E] to make the change. *** She thinks he would be fine if he lived with her." Leavitt recommended that no changes should be made for E for at least a year.

Between January and April 2011, mother and stepmother had several aggressive interactions in front of E. The first occurred after mother signed E up to attend "Winter Spring" with mother, a group for children experiencing loss that met every other Wednesday on mother's parenting night. E asked stepmother to go to one of the meetings, so she did. However, when mother arrived with E, mother caused a loud scene because she was upset that stepmother was there on her time with E, and she threatened to leave with E if stepmother did not leave. E was a witness to the entire scene, which, Leavitt testified, was very upsetting to E. Stepmother was able to attend one Winter Spring meeting with E that occurred when it was not mother's parenting time. On that occasion, E was excited to have her there because "he's hesitant to talk about [father] with [mother] because they didn't really talk[.]" Mother testified that she did not want stepmother attending Winter Spring when she was there with E because she felt that it was better for E that way and that stepmother could attend with E when it was not mother's night with him.

The day after the incident at Winter Spring, mother dropped E off at stepmother's house after he had been sick during the day. Stepmother tried to close the door, but mother stopped her, tried to come in the house, and caused another loud scene about being able to talk to E later that night. Stepmother then had to remind mother by text message that night to call E, which mother did after getting the text. After that incident, stepmother requested that mother meet her at her church to drop off E after services, but mother refused because she did not want to go to stepmother's church.

There was also significant tension between mother and stepmother over E's basketball games. After the temporary custody hearing, stepmother told E that he could play basketball, and those games occurred every Saturday, including the weekends E was with mother. Mother was very upset that stepmother had scheduled anything during her time with E and refused to take E to basketball games on her Saturdays, because mother felt that E needed a day of "down time." Mother did take E to the game that included picture day. On that day, stepmother came to the game to

give E his uniform, and it ended with mother ripping a bag out of stepmother's hands that stepmother had put E's clothes into after he changed into his uniform. Mother felt that that incident was "mutual," that is, that both she and stepmother were responsible for what had occurred.

Witnesses at the permanent custody hearing again testified that mother and E had good interactions when they were together. However, E was having trouble with the transitions in care. Stepmother testified that, when E returned from mother's house, he was quiet and shy and "talks baby talk." It would take E a little while "to open up and remember that he's home and that he can relax and just be a kid."

Mother also volunteered with E's class on Wednesdays. However, when mother first arrived in town in November, she was coming more often, and the teacher and principal had to ask her not to come so often because it was distracting. By the time of the April hearing, mother testified that she would keep E in the same school until the end of the school year because "[i]t would be terrible for—for [E] and it would be terrible for the rest of the kids if I were to leave early. If [E] and I were to leave early[.]" She also testified that she was willing to take a slower transition with E but did not think it should be a year and wanted an opinion from someone other than Leavitt.

At the close of stepmother's case, mother moved for a "directed verdict," which the trial court denied. At the close of all evidence, and after the parties submitted written closing arguments, the trial court granted stepmother's petition for permanent custody of E. The trial court concluded that stepmother had established all five statutory factors to rebut the statutory presumption that mother was acting in E's best interests and that it was in E's best interest to remain in stepmother's custody. The trial court set out its findings in a lengthy letter opinion, which we discuss in detail below. The trial court also awarded mother parenting time. The court entered a general judgment that reflected its findings, which mother appeals.

On appeal, mother assigns error to the trial court's denial of her motions to dismiss for insufficient evidence, ORCP 54 B(2), and granting of temporary and final custody

of E to stepmother. Mother combines her arguments with respect to all of her assignments of error into a single argument contesting the sufficiency of the evidence to establish that stepmother had rebutted the statutory presumption. Accordingly, we confine our analysis to whether the trial court erred in making the final award of custody of E to stepmother under ORS 109.119.

## II.   ANALYSIS UNDER ORS 109.119

As noted above, it is undisputed that stepmother established that she had a child-parent relationship with E. Thus, under ORS 109.119 (set out above, 265 Or App at 196-97 n 1), we must first determine if the evidence is legally sufficient to support the trial court's determination that stepmother had rebutted the statutory presumption that mother acts in the best interest of E. If the evidence is legally sufficient to support that determination, we must then determine if the trial court abused its discretion in awarding custody of E to stepmother, based upon the "best interest of the child." ORS 109.119(3)(a). For our analysis, we first turn to the five nonexclusive rebuttal factors under ORS 109.119(4)(b) and the findings the trial court made with respect to each factor. In reviewing those factors, we keep in mind that the nonexclusive factors are matters that a court may consider, in addition to other relevant evidence taken at trial; "[t]he statutory touchstone is whether the evidence at trial overcomes the presumption that a legal parent acts in the best interest of the child, not whether the evidence supports one, two, or all five of the nonexclusive factors indentified in ORS 109.119(4)(b)." *O'Donnell-Lamont*, 337 Or at 108.

A. *Determination whether the statutory presumption has been rebutted*

The first rebuttal factor is whether "[t]he legal parent is unwilling or unable to care adequately for the child[.]" ORS 109.119(4)(b)(A). Under that factor, a court cannot "substitute its judgment for that of a parent by determining that the nonparent is *better* able to care for the child." *O'Donnell-Lamont*, 337 Or at 110 (emphasis in original). The Supreme Court has explained that "[t]he legislature's use of the word 'adequate' suggests that the parent must have the willingness and ability to provide something more

than a bare subsistence level of care for the child, but that it would be inappropriate to compare a parent's 'adequate' care with a nonparent's 'more than adequate' care in considering this factor." *Id.* Although past inadequacies may inform this factor, the court is required to assess the parent's *present* willingness and ability to adequately care for the child in determining if the factor is established. *See Strome and Strome*, 201 Or App 625, 633, 120 P3d 499, *rev den*, 339 Or 701 (2005) (focusing on the parent's recent adequacy when discussing factor).

Here, the trial court determined that stepmother established this factor, finding that

> "[t]he evidence is uncontroverted that [mother] willingly left her child [E] with his father the decedent and [stepmother] for months on end. Certainly an unwillingness to parent was exhibited by her during this period. [Mother] would like the Court to believe she has now committed to her role as a parent and will now be able and willing to care for [E]. Based on historical evidence, the Court is unable to conclude this is in fact true however. 'Actions speak louder than words' and to the extent [mother] has 'acted' it has been for her own benefit as opposed to putting her child's needs first. The Court concludes [mother] does not establish this factor."

Mother argues on appeal that her leaving E with father in the past cannot establish this factor because she since has obtained work locally and has demonstrated that she seeks to spend as much time with E as possible and is devoted to him during that time. Mother also argues that the trial court appeared to have improperly shifted the burden of proof to mother on this factor.

We agree with mother that the evidence is insufficient to support the trial court's conclusion that this rebuttal factor was established. Although the trial court expressed concerns about mother's *past* absenteeism from E's life and about mother's *future* commitment to care for E, this factor requires that the trial court focus on the legal parent's *present* parental fitness. The evidence in the record demonstrated that mother was presently willing and able to adequately care for E at the time of the two hearings, and the trial court did not find otherwise.

The second rebuttal factor is whether stepmother "is or recently has been the child's primary caretaker[.]" ORS 109.119(4)(b)(B). "This factor focuses on the interest in continuity of caregiving and the relationship between the child and the nonparent seeking custody." *O'Donnell-Lamont*, 337 Or at 111. The trial court found that the parties had agreed that stepmother established this factor and found that stepmother continued to be E's primary caretaker at the time of the final April 2011 hearing. Mother does not dispute that stepmother established this factor, but she argues that it should not be given much weight. Based on the parties' agreement and the evidence, the trial court did not err in concluding that stepmother established this factor.

The third rebuttal factor is whether "[c]ircumstances detrimental to the child exist" if stepmother is denied custody. ORS 109.119(4)(b)(C). "'Circumstances detrimental to the child' includes but is not limited to circumstances that may cause psychological, emotional or physical harm to a child." ORS 109.119(10)(b). With regard to that factor, "circumstances detrimental to the child" "refers to circumstances that pose a serious *present* risk of psychological, emotional, or physical harm to a child." *O'Donnell-Lamont*, 337 Or at 112 (emphasis added).

The trial court concluded that stepmother also established that factor, finding that

"[t]he evidence was clear that [E] had a healthy, loving relationship with [stepmother] and overwhelming support from [stepmother's] family. Having just experienced the death of his natural father, it should be obvious that removal to anyone (including a natural mother who has not had significant contact for years) would be detrimental. Testimony from [stepmother] established even the periodic visits with [mother] have been somewhat traumatic, but the professional counselor Blandine Leavitt also established [that] even contact that should be helping [E] has been turned 'toxic' by [mother's] actions. The Court notes that although grief counseling at 'Winter-Spring' Counseling should be helping [E], [mother] caused such a disturbance there that [stepmother] was forced to leave. [Mother] began volunteering at [E's] grade school *** and that caused problems as well. Although there was evidence that [mother] had provided a healthy home life years ago for [E], the

complete lack of sensitivity to [stepmother], [stepmother's] family and [E] upon her return on November 10, 2010 when [father] died, causes the Court to question [mother's] real motivation in even contesting this matter. The Court has previously stated that the circumstances of [mother's] return to the [stepmother's] household complete with law enforcement support is almost beyond belief. The totality of these events and [mother's] actions to the date of the hearing convince the Court that [E] would be detrimentally impacted by [mother] if the opportunity were given."

Mother argues that stepmother failed to show what harm would come to E, with a gradual transition for E to mother along with "plenty of counseling." She asserts that the evidence shows that E is loved and well-cared for with her, the memory of his father is preserved, and that "stepmother is treated with an appropriate level of respect and viewed in a positive light." Mother asserts that her difficulties with stepmother are not connected to harm that E would suffer.

We, however, conclude that the evidence in the record supports the trial court's findings, and that the trial court's findings are sufficient to conclude that stepmother established this factor. E's father had just died the day that mother came back to Oregon. Despite that, mother insisted that E spend the weekend with her, and then, on Monday, she involved the police so that she could immediately take custody of E, a seven-year-old child whom she had not seen at all the previous six months and with whom she had had little contact for at least the previous year. Once stepmother obtained the *status quo* order, mother continued to insist that E be transferred to her custody immediately.

At both the temporary and final custody hearings, mother would not accept Leavitt's opinion that E needed things to stay exactly the same for at least a year and that not doing so put him at an even greater risk for depression. Mother continued to insist that E should move into her home in a different town and begin at a new school in the fall, with much reduced contact with stepmother, all of which Leavitt testified would be felt as additional losses by E. Between the temporary and final custody hearings, mother behaved aggressively and antagonistically toward stepmother whenever they

met, and did so in front of E. Leavitt testified that the stress of the situation between mother and stepmother, coupled with the death of his father, was causing E to "shut down." Stepmother also testified that, upon returning from mother's house for visits, E was shy and used "baby talk," and it took E a little while "to open up and remember that he's home and that he can relax and just be a kid."

There is sufficient evidence in the record to support the trial court's determination that stepmother established that transferring custody to mother would result in a serious risk of present emotional and psychological harm to E. Mother's argument that stepmother failed to show harm to E with a slow transition and counseling ignores that mother was not seeking a slow transition for E at the time of the hearings, and that there was no evidence of what counseling mother would provide. The trial court correctly focused on the evidence of E's present circumstances in considering this factor and the serious risk of harm from the many changes for E that would accompany a change in custody to mother and from the continuing antagonism expressed by mother towards stepmother.

The fourth rebuttal factor is whether mother "has fostered, encouraged or consented to the relationship between the child and [stepmother.]" ORS 109.119(4)(b)(D). The trial court concluded that that factor weighed in favor of stepmother, finding that

"[mother] clearly felt [stepmother] was an appropriate caregiver for many years and virtually ignored [E] for most of the time she was travelling, entrusting his care to [stepmother]. This is in part what makes her actions upon returning to the Rogue Valley when she learned of [father's] death so troubling. What had changed? There was no evidence that [stepmother] had suddenly become a 'bad' parent, yet [mother] demanded her son ... immediately. The Court concludes that [mother's] motives are suspect and that she demonstrated by her earlier nonexistent involvement that she trusted [stepmother] to raise her child."

Mother argues that she only fostered a relationship between E and father, not with stepmother. Even if this factor is established, mother argues, it should not be given much weight because supporting a relationship between E

and father's new wife would be evidence that mother was acting in E's best interests.

We conclude that the trial court did not err in concluding that stepmother established the fourth factor, because mother had at least consented to the relationship between E and stepmother and mother had never objected to stepmother's caretaking of E.

The fifth and final rebuttal factor is whether mother "has unreasonably denied or limited contact between the child and [stepmother]." That factor also "focuses on the relationship between the child and a nonparent and, specifically, on the potential harm to a child's interest when a parent terminates or limits such a relationship." *O'Donnell-Lamont*, 337 Or at 116. The trial court concluded that the factor weighed in stepmother's favor:

> "The Court is of the opinion after hearing several days of testimony in this matter that [mother] since returning to Southern Oregon in November, 2010, has done everything in her power to eliminate contact with [stepmother]. Her initial actions were so aggressive in this regard that [stepmother] was required to obtain a Status Quo Order to keep her from leaving with the child. As stated above even the most neutral and seemingly innocuous contact with [stepmother] ([basketball] games, counseling[,] school) has resulted in angry confrontation with [stepmother]. The Court concludes that [mother] is incapable of allowing normal contact with [E] and [stepmother], and will undoubtedly require periodic Court involvement to facilitate simple parenting time."

Mother argues that she did not unreasonably limit contact or attempt to limit contact between E and stepmother because she correctly believed that she was entitled to custody of E and more contact with E after father's death. Mother disputes that the trial court's finding that she has "done everything in her power to eliminate contact with [stepmother]" has an evidentiary basis in the record. We conclude that the record supports that finding and the other trial court findings and conclusions relevant to mother's attempts to limit E's contact with stepmother. The record supports the trial court's finding that

mother's initial goal was to unreasonably limit or eliminate contact between E and stepmother. Mother immediately tried to remove E from stepmother's home, beginning the day of father's death. Mother continued to argue for much reduced contact for stepmother and only began to back off her most unreasonable positions because of the court's intervention. Mother's aggressive behavior toward stepmother in refusing to share activities with stepmother that were important to E—basketball and grief counseling—demonstrated mother's continuing intention to unreasonably limit stepmother's contact with E in a way that harmed E's interests.

Having discussed each of the nonexclusive factors, which a trial court may consider, along with other relevant evidence, we conclude that the evidence taken as a whole is legally sufficient to support the trial court's determination that stepmother, by a preponderance of the evidence, in accordance with ORS 109.119(3)(a), rebutted the presumption that mother acts in the best interest of E. *O'Donnell-Lamont*, 337 Or at 108 ("The statutory touchstone is whether the evidence at trial overcomes the presumption that a legal parent acts in the best interest of the child, not whether the evidence supports one, two, or all five of the nonexclusive factors indentified in ORS 109.119(4)(b)."). All of mother's conduct, and her apparent disregard of the serious risk of emotional and psychological harm to E of further upset in his life following the death of his father, supports the trial court's determination that mother seeks to act in her own best interest and not that of E.

Although we conclude that stepmother did not establish that mother is unwilling or unable to adequately care for E, the trial court's findings in connection with that factor were supported by evidence in the record and were relevant to the trial court's ultimate determination that stepmother had rebutted the statutory presumption, even though that evidence did not establish that particular factor. *See id.* at 108 ("In specific cases, the weight to be given to each of the five statutory factors, to the evidence supporting those factors, *and to other relevant evidence,* will vary." (Emphasis added.)). As a result, it would be inappropriate for us to remand the case to the trial court to reconsider its

final determination, because the evidence and findings on which the court relied in the first instance were permissible considerations and would remain precisely the same.[2] We are convinced, given the trial court's findings and articulated reasoning, that the trial court's ultimate determination would not change were we to remand. *See id.* at 109 ("[N]othing in the text of ORS 109.119 *** suggests that such proof [of a parent being unable or unwilling to adequately care for the child] is required for the nonparent to rebut the presumption that the parent acts in the best interest of the child.").

## B. *Determination of the best interest of the child*

Because stepmother rebutted the presumption for mother in ORS 109.119, we turn to the "best interest" analysis required by that statute. Under ORS 109.119(3)(a), the court "shall grant custody" to stepmother "if to do so is in the best interest of the child." That inquiry is separate from the one undertaken to determine whether stepmother rebutted the statutory presumption. Conducting that separate inquiry, the trial court found and concluded as follows:

> "The Court feels that although [mother] may provide adequate parenting skills during parenting time, the best interest of the child require [stepmother] to have legal custody. Considering all the factors of ORS 107.137 the Court finds [stepmother] to be credible and with a plain desire to do what is best for [E]. As the Court pointed out previously and reconfirmed at the April 20, 2011 trial, [mother] has a desire to do what's best for her and right now that means she would like [E] returned to her. The Court is not convinced [mother] has given any thought to whether this is in fact best for [E]. This has been born out in her actions with [E] and [stepmother] since the January 26, 2011 hearing. The Court cannot 'gamble' on [mother's] stated good intentions when until November, 2010 when she returned to Southern Oregon she had been completely 'missing in

---

[2] In so concluding, we note that this is not a situation in which we have concluded that evidence on which the trial court relied was incompetent or irrelevant, or that findings of the trial court were unsupported by evidence in the record, both of which circumstances could affect the trial court's final determination based on the entire record.

action' insofar as [E] was concerned. The Court therefore orders custody of [E] shall be awarded [to stepmother] as this is in the child's best interest."[3]

We have discussed the pertinent evidence above, and repeating it here will not serve a useful purpose. That evidence supports the trial court's discretionary determination, and mother does not argue that a different discretionary determination should have been made should we affirm the trial court's determination that stepmother rebutted the statutory presumption. *See Underwood*, 255 Or App at 193. The trial court did not err in awarding custody of E to stepmother.

Affirmed.

---

[3] Under ORS 107.137, in determining custody of a minor child, usually in dissolution of marriage or modification of a judgment of dissolution, the court considers enumerated factors in determining the best interests and welfare of the child. Courts use that standard in ORS 107.137 in cases such as this one. *O'Donnell-Lamont*, 337 Or at 94 n 3.