Argued and submitted May 10, reversed and remanded September 26, respondent Dana M. Jensen's motion - vacate the appellate decision and dismiss the appeal filed October 30, 2007; appellant's response - respondent's motion to vacate appellate decision and dismiss the appeal filed November 7, 2007; respondent's reply - motion to vacate decision and dismiss the appeal filed November 21, 2007; appellant's motion - reconsider order filed October 4, 2007; respondent's response - petition for reconsideration filed October 30, 2007; and appellant's reply - petition for reconsideration filed November 7 addressed by opinion December 26, 2007
See 217 Or App 309, _____ P3d _____ (2007)

In the Matter of

Dana M. JENSEN,
*Petitioner-Respondent,*

*v.*

Tori Michelle BEVARD,
*Respondent-Appellant,*

*and*

Ricky Wayne JONES,
*Respondent-Respondent.*

Washington County Circuit Court
C043952DRA

In the Matter of

Tori Michelle BEVARD,
*Petitioner-Appellant,*

*v.*

Ricky Wayne JONES,
*Respondent-Respondent.*

Washington County Circuit Court
C042721DRB; A129611

168 P3d 1209

Margaret H. Leek Leiberan argued the cause for appellant. With her on the briefs was Mason & Associates.

David N. Hobson, Jr., argued the cause for respondent Dana M. Jensen. With him on the brief were Erika K. Tuenge and Hobson & Angell, L.L.P.

No appearance for respondent Ricky Wayne Jones.

Before Landau, Presiding Judge, and Schuman and Ortega,* Judges.

SCHUMAN, J.

---

* Ortega, J., *vice* Riggs, S. J.

**SCHUMAN, J.**

In this case, we are called on to resolve a dispute between a woman and her own mother over custody of the woman's child, D. We refer to the parties from the perspective of D, that is, as mother and grandmother. The trial court awarded sole custody to grandmother, gave mother parenting time alternating between two days and one day per week, and ordered mother to pay grandmother $15,514 in attorney fees. Mother assigns error to all of those outcomes.[1] Because we agree with mother that grandmother and D did not have the "child-parent relationship" that stands as a statutory prerequisite to receiving custody, we reverse and remand.

That relationship is defined in ORS 109.119(10)(a):

" 'Child-parent relationship' means a relationship that exists or did exist, in whole or in part, within the six months preceding the filing of an action under this section, and in which relationship a person having physical custody of a child or residing in the same household as the child supplied, or otherwise made available to the child, food, clothing, shelter and incidental necessaries and provided the child with necessary care, education and discipline, and which relationship continued on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfilled the child's psychological needs for a parent as well as the child's physical needs."

If the court determines that a child-parent relationship exists and that the petitioner is able to overcome the presumption that the legal parent acts in the best interest of the child, the court "shall grant custody, guardianship, right of visitation or other right to the person having the child-parent relationship, if to do so is in the best interest of the child." ORS 109.119(3)(a). If no child-parent relationship exists, the court can in some circumstances grant visitation, but it cannot grant custody. *See* ORS 109.119(3)(b) (describing circumstances under which a lesser relationship may entitle a person to "visitation or contact rights").

---

[1] Grandmother also sought and received custody of another of mother's children, M. Since the trial, however, the parties agreed to a stipulated supplemental judgment resolving custody of M, and, in any event, M has turned 18, so the question of her custody is not before us on appeal.

In the present case, the court found that grandmother had a child-parent relationship with D, and then went on to find that grandmother had overcome the presumption in favor of mother's parental rights and that D's best interest would be served by being in grandmother's custody, with limited visitation from mother. Because we base our determination on the threshold question of whether grandmother and D had a child-parent relationship, and we base that determination, in turn, on the determination that grandmother neither had physical custody of D (an undisputed fact) nor "resid[ed] in the same household" as D "on a day-to-day basis," ORS 109.119(10)(a), we recite only the facts relevant to that latter factor. Further, we recite those facts as we find them on *de novo* review, ORS 19.415(3), although we give considerable weight to the trial court's demeanor-based credibility determinations. *O'Donnell-Lamont and Lamont*, 337 Or 86, 89, 91 P3d 721 (2004), *cert den*, 543 US 1050 (2005).

Employed as a caregiver in an adult care facility, mother normally worked consecutive 24-hour shifts from 7:00 p.m. on Thursdays until 5:00 p.m. on Mondays. During those weekend shifts, grandmother over the years had taken care of D at her home; D generally stayed in a room set aside for him there from Friday evening through Monday evening. However, six months before grandmother filed this case, mother was involved in a car accident that left her with fractures in an arm, a leg, a foot, her face, and her ribs, as well as massive contusions. She had several surgeries and was hospitalized for four weeks, followed by several weeks in rehabilitation. During that period, mother continued to rely on grandmother for child care on many weekends, but by no means on all of them. Grandmother took a weekend trip to Canada shortly after mother returned from rehabilitation, and she also took a 13-day trip to Europe during mother's recovery. Other people also provided significant amounts of care for D. D's father, from whom mother was separated, spent—according to his uncontradicted testimony—every night for two months at mother's home. D's sister and one of mother's friends also provided child care during that period.

■ Although mother and grandmother generally agree about those facts, they disagree about whether the facts

establish that grandmother resided in the same household as D. The resolution of that disagreement depends on explicating the statutory definition of "child-parent relationship" in ORS 109.119(10)(a). The statute specifies that all or part of the relationship must exist within the six months preceding the filing of the action. In *Harrington v. Daum*, 172 Or App 188, 192 n 2, 18 P3d 456 (2001), we rejected the petitioner's argument that "frequent visits and weekend stays [with petitioner in his home] meant that the children resided in his household 'in part' during the statutory six-month period. * * * The reference to 'in part,' thus, is to *when* the relationship exists." (Emphasis in original.) Thus, our inquiry does not focus on whether, during the days when D stayed with grandmother, the two resided in the same household; it focuses on whether grandmother, in whose house D frequently stayed for three days per week during the six months preceding the filing of this action, can be said to have resided in the same household as D during that period "on a day-to-day basis."

Beyond clarifying the question, the text of ORS 109.119(10)(a) provides little guidance. To "reside" is "to dwell permanently or continuously," or to "have a settled abode for a time." *Webster's Third New Int'l Dictionary* 1931 (unabridged ed 2002). "Day-to-day" means "a day at a time in unbroken succession." *Id.* at 578. Neither of these definitions directly addresses the crux of this case, that is, whether persons who live together "permanently or continuously" at a "settled abode" for irregularly repeated periods of three successive days per week "reside" in the same household on a "day-to-day" basis. Each three-day stay is an unbroken interval and is continuous—for three days—but none is permanent.

Case law interpreting the phrase "residing in the same household * * * on a day-to-day basis" is sparse. Grandmother's status in this case resembles in many important features the status of the unsuccessful petitioner in *Harrington*. In that case, a nonparent petitioner sought visitation of children and contended that he had a child-parent relationship with them. We summarized the facts as follows:

"The marriage between father and the children's mother was dissolved in November 1995. The dissolution judgment awarded custody of the children to mother and gave father substantial visitation rights. About a month after the dissolution became final, petitioner met mother, and they began dating. By February 1996, petitioner and mother were seeing each other several times a week, with the children often included. From the summer of 1996 until mother's death in August 1997, mother and petitioner had dinner together most evenings, and mother spent the weekends at petitioner's apartment. The children were included, except when they were with father. Petitioner established a play area in one part of his living room for the children, furnishing it with appropriate toys and stuffed animals. Because he got off work before mother, petitioner usually picked up the children from day care. The children liked petitioner and enjoyed being with him.

"In late August 1997, petitioner took the children on an overnight church outing that was limited to men and boys. That weekend, mother died in an automobile accident. After a short dispute with mother's parents, father took custody of the children and moved back into mother's house, which had been the marital home before the dissolution and had remained the children['s] home thereafter. Petitioner wanted to remain active in the children's life, and father allowed him to see the children several times. * * * Petitioner attended the children's swimming lessons when father was unable to do so because his work shift ended later, and he did not correct the children when they called him 'dad.' "

172 Or App at 190-91. Like grandmother, the petitioner in *Harrington* spent many weekends with the children and adapted his home to their presence. In addition, the children ate at his home frequently, and he was an active participant in their activities. We nonetheless concluded:

"[T]he trial court erred in finding that there was a child-parent relationship. Although petitioner was close to the children before mother's death, and although he, mother and the children spent a significant amount of time at each other's residences, petitioner and mother maintained separate households. Petitioner was never part of the same household as the children."

*Id.* at 192.

Because the existence of a child-parent relationship is necessarily a fact-specific inquiry, however, the similarities between the petitioner in *Harrington* and grandmother in this case, while strongly suggestive, do not necessarily compel similar outcomes. The legislative history of ORS 109.119(10)(a), however, does.

Before 1987, the definition of "child-parent relationship" did not contain the "residing in the same household" language that is at the heart of this case. The earlier statute provided:

> "As used in this section, 'child-parent relationship' means a relationship that continues on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfills the child's psychological needs for a parent as well as the child's physical needs."

ORS 109.119(5) (1985), *amended by* Or Laws 1987, ch 810, §§ 4-5. The statute did not contain any provision for nonparents with something less than a child-parent relationship to petition for access less than custody or guardianship. The distinction between the lesser relationship (an "ongoing personal relationship") entitling a nonparent to petition for visitation or contact rights, and a "child-parent relationship" entitling a nonparent to petition for "custody, guardianship, right of visitation, or other generally recognized right" was added in 1987, along with the more detailed definition of "child-parent relationship" containing the "residing in the same household" language. HB 3197 (1987); Or Laws 1987, ch 810, §§ 4-5. That definition has not changed significantly and is now ORS 109.119(10)(a), quoted above.

According to the staff measure analyses presented to both chambers of the 1987 Legislative Assembly, the new definition was intended to shrink significantly the universe of so-called psychological parents who could qualify to have a "child-parent relationship" for purposes of obtaining custody. In the analysis of House Bill (HB) 3197 by the Senate Committee on Judiciary, committee counsel reported that the new definition "[s]ignificantly tightens and restricts the definition of 'child-parent' relationship required for relief, including requirements that the petitioner has physical custody and has fulfilled the child's material and emotional needs."

Staff Measure Analysis, Senate Committee on Judiciary, HB 3197, 1987. The House Committee on Judiciary was informed by its counsel that the more detailed definition "has the effect of limiting the persons who would qualify under the statute" to those who have child-parent relationships. Staff Measure Analysis, House Committee on Judiciary, HB 3197, 1987. Generally, then, the current statutory definition of "child-parent relationship" is narrower than its predecessor.

More specifically, and with particular relevance to the facts of the present case, the version of HB 3179 that emerged from the House did not contain any language referring to nonparents "residing in the same household" as a child. The House version required a nonparent to have had *physical custody* of a child in order to qualify for legal custody, but it did not contain any residence or household language. *See* Tape Recording, House Committee on Judiciary, Subcommittee 3, HB 3179, Apr 8, 1987, Tape 375 (statement of Virginia Vanderbilt, committee counsel). Nor did it contain any provision for obtaining *visitation* based on a relationship that was less than child-parent. On the Senate side, the Judiciary Committee received a memorandum from its counsel identifying these gaps as "problems" and suggesting "solutions." The memorandum stated:

"PROBLEM:   The bona fide psychological parent may have been *residing in the same household* with the child or spending substantial periods of time with the child daily in a different household, but technically not be the 'physical custodian.' * * *

"SOLUTION:   Require the petitioner to have physical custody *or to have resided with the child in the same household.* Note that this solution deals with only those in the household. Other bona fide psychological parents may still be excluded, but to go further might create a risk of abuse or improper intervention.

"* * * * *

"PROBLEM:   The physical custody definition * * * excludes a significant class of persons who have significant relationships with the child and who desire to maintain formal contact, short of custody. * * *

> "SOLUTION: Insert the following subsection: '* * * A person who has maintained an ongoing personal relationship with [a child] * * * may petition the court [in] the county in which the minor child resides for an order providing for reasonable visitation rights.' "

Memorandum from Mark Kramer, committee counsel, to Senate Judiciary Committee Members, regarding HB 3197, June 1, 1987 (emphasis added).

The next day, a witness named Wanda Ramberg testified before the Senate Committee on Judiciary that she and her husband had petitioned for visitation rights to their son's "natural" child. She explained that the child had stayed with them every weekend from Friday night until Monday night and that they had provided him with all of his food, clothing, and other necessities for five and a half years. However, she related, she and her husband found themselves unable to obtain visitation. Because their son had never acknowledged paternity, the Rambergs were not legally the child's grandparents and could not obtain visitation under the then-existing grandparent visitation statute, *former* ORS 109.121 (1983), *repealed by* Or Laws 2001, ch 873, § 2. Nor were they successful in obtaining visitation under the then-existing version of ORS 109.119, which required a child-parent relationship even for visitation and, as noted above, had no provision for visitation based on an ongoing personal relationship. Tape Recording, Senate Committee on Judiciary, HB 3197, June 2, 1987, Tape 167, Side A, Tape 166, Side B (statement of Wanda Ramberg).

Committee counsel Kramer, the author of the memorandum suggesting "residing in the same household" language and visitation based on an ongoing personal relationship, explained that the Rambergs "fell into a hole." He explained that, under both the current and the proposed versions of ORS 109.119, the Rambergs would not qualify for visitation. Because they were not grandparents, they would not qualify under the grandparent visitation statute, and because their relationship with the child *"comes close to but doesn't meet, the day-to-day requirements"* necessary to establish visitation under the House version of ORS 109.119, they

would not qualify under that statute. His proposed amendment to the House version, he informed the committee, "attempts to deal with the problem" by establishing a process by which people in the Rambergs' situation—people who had an ongoing personal relationship with a child, but were neither grandparents nor people who had resided with a child "on a day-to-day basis"—could nonetheless obtain visitation. Tape Recording, Senate Committee on Judiciary, HB 3197, June 2, 1987, Tape 166, Side B (statement of Mark Kramer, committee counsel).

Committee counsel Kramer's testimony provides useful insight into the question before us in this case. He explained that a person who cared for a child for three days and three nights each week for years and provided the child with necessities would nonetheless not be able to establish a child-parent relationship because such a person would not meet the "day-to-day" requirement. He urged the committee to amend the House version of HB 3197 by adding a provision that would allow people in the Rambergs' situation—a situation not meaningfully distinct from grandmother's in the present case—to obtain *visitation*. The committee apparently heeded counsel's advice. The statute, with his "solutions" to the "problems," was enacted, and it is not materially different from the statute at issue here.

■ We recognize that legislative history that does not directly address the issue before us, even testimony from the apparent drafter of the language we are construing, is of limited authority. However, seen in the context of the statutory definition's text and *Harrington*, it points decisively to one conclusion: A nonparent who cares for a child in the nonparent's home on many, but not all, weekends, while the parent is at work, does not reside in the same household as the child on a day-to-day basis for purposes of ORS 109.119(10)(a). That conclusion is bolstered by the unacceptable implications of its opposite: that parents who, for employment or some other reason, need to be away from their children for regular extended periods are at risk of losing custody of their offspring to child care providers to whom the offspring have formed strong attachments.

Reversed and remanded.