Argued and submitted October 6, affirmed December 16, 2015, petition for review denied April 7, 2016 (359 Or 39)

In the Matter of the Marriage of

Adam Joseph SOUTHARD,
*Petitioner-Respondent,*
*and*

Kirsten Robine LARKINS,
*Respondent-Appellant,*
*and*

Jeffery LARKINS,
*Intervenor-Respondent.*

Multnomah County Circuit Court
120464547; A158190

365 P3d 1089

Adam L. Dean argued the cause and filed the brief for appellant.

Andrew J. Ragland argued the cause and filed the brief for respondent Adam Southard.

No appearance for respondent Jeffery Larkins.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

DEVORE, J.

## DEVORE, J.

Mother appeals a supplemental judgment that essentially continued an earlier custody award to Southard of three children, H, S, and AR. With the supplemental judgment, the trial court denied mother's motion to modify custody and granted Southard's motion for custody of AR as a "psychological parent" pursuant to ORS 109.119.[1] We write to address mother's assignment of error regarding the court's recognition of Southard as a person with a parent-child relationship with AR, its finding that Southard had rebutted the presumption that mother acts in the best interest of the child, and its conclusion that granting custody to Southard was in AR's best interest. We reject mother's second and third assignments without written discussion, and we affirm.[2]

## I.  FACTS

The facts are convoluted. They led to several proceedings in circuit court and to this, the second of two appeals. Like the parties, we refer initially to the facts relating to the prior appeal, *Southard and Larkins*, 275 Or App 89, 364 P3d 1006 (2015) (hereafter *Southard I*). Later, we will refer to the specific facts, developed here, when we apply the statutory factors of ORS 109.119 to this case.

By way of introduction, we summarize that mother married two men, Southard and Larkins, each twice. Mother's first and fourth marriages were to Southard; her

---

[1] Although not parallel, we refer to wife, whose name is Larkins, as "mother," to stepfather as "Southard," and to AR's biological father as "Larkins," in order to avoid confusion.

[2] Mother's second assignment of error concerns denial of her motion for a modification of custody as to the three children based on a determination of paternity as to AR and her consequent argument that, because AR's custody should change, the other children's custody should change to mother to keep the children together. Our resolution of the first assignment of error concerning AR's custody eliminates mother's central argument for a change of custody as to the three children.

Mother's third assignment of error concerns her objection to the judge, who heard the dissolution matter, continuing to hear the latest post-dissolution motions at issue here. In a separate paternity proceeding, Larkins had interposed an affidavit of prejudice against that judge under ORS 14.250. We rejected the same argument in our recent opinion on mother's appeal from the dissolution judgment. *Southard and Larkins*, 275 Or App 89, 91 n 2, 364 P3d 1006 (2015).

second and third marriages were to Larkins. The three children at issue here were born of those relationships.

H and S were born to mother and Southard in their first marriage. That marriage was annulled in 2006, and mother was awarded custody of the two children.

Mother married Larkins in 2007. Mother and Larkins divorced in February 2008. At the time, mother was pregnant with AR. As part of that dissolution, mother attested she was "currently pregnant, [b]ut paternity has not been established and [Larkins] should not be presumed to be the father." *See* ORS 109.070(1)(b) (rebuttable presumption). As consequence, the dissolution judgment concluded that mother had rebutted the statutory presumption that Larkins was the child's father.

Mother gave birth to AR in April 2008. Southard was present at the birth, and he was listed on AR's birth certificate as the child's father. Mother had misinformed the hospital staff that she was married to Southard. He signed the documents that were handed to him, reportedly not realizing that mother had asserted that they were married. AR shares a last name with Southard, rather than with mother. DNA testing later indicated that Larkins is AR's biological father.

In August 2008, mother remarried Larkins.[3]

In July 2009, mother remarried Southard. In 2012, Southard filed a petition for dissolution of the marriage, seeking custody of all three children. Mother helped Larkins with paperwork, seeking to intervene in the dissolution to establish his paternity of AR. The court denied Larkins' request to intervene, at least at that time.[4] Larkins initiated a separate paternity proceeding. Before paternity was resolved, the dissolution court recognized that Southard was AR's legal, if not biological father. The court dissolved the Southard marriage and awarded Southard custody of the three children, H, S, and AR.

---

[3] Much later, mother filed an affidavit explaining that, when remarrying Larkins, she did not then believe her marriage to him was official because they "did not record the marriage certificate."

[4] Larkins was later allowed to intervene in post-judgment proceedings after his paternity had been established.

In another proceeding, mother prompted a change in her earlier dissolution judgment involving Larkins so as to remove the finding that disestablished him as AR's father. With that impediment removed, the court in Larkins' paternity proceeding acknowledged the statutory presumption that AR, born within 300 days of the first Larkins marriage, was Larkins' child. ORS 109.070(1)(b) (rebuttable presumption). The paternity court, however, did not disturb the custody determination from the Southard dissolution.

Mother then moved to set aside the dissolution judgment based on the paternity determination. Her motion was denied. Mother appealed from the dissolution judgment, from the paternity judgment (which had not re-determined custody), and from the order denying her motion to set aside the dissolution judgment. Those matters were consolidated for appeal in *Southard I*.

Before our decision in *Southard I*, mother and Southard returned to the circuit court with competing motions that form the basis of this second appeal. Southard moved for an award of custody of AR as a "psychological parent" pursuant to ORS 109.119, while mother filed a motion seeking custody of the three children, asserting a change of circumstances in the resolution of AR's paternity. In these proceedings, Larkins was made a party, but the court found him to be in default. The court determined that Southard had a parent-child relationship with AR, that Southard had rebutted the presumption that mother acted in the child's best interest, and that the best interest of AR would be served if custody was maintained with Southard.

Thereafter, in *Southard I*, we resolved the issues from the Southard dissolution, paternity judgment, and motion for relief from the dissolution judgment. Among other things, mother argued that her second marriage to Southard was void because, at the time of that marriage, she was still married to Larkins and that the court did not have the authority or jurisdiction to award custody of AR as in an ordinary dissolution.[5] We determined that mother did

---

[5] Jurisdiction was put at issue by mother's motion for relief from judgment under ORCP 71.

not present the necessary evidence or develop the argument that her marriage to Southard was void. We concluded that the court had the authority, and certainly the jurisdiction, to dissolve the marriage and make a custody determination. We affirmed the court's custody award of the three children to Southard. Some of those determinations help to determine this second appeal.

## II.  LAW

### A.  *Nonparent Custody*

In this second appeal, we address mother's challenge to the award of custody to a person who is not a biological or adoptive parent. Before examining her challenge, we review ORS 109.119 and the standards of review that frame our analysis.

Under ORS 109.119(1), "any person, including but not limited to a * * * stepparent * * * who has established emotional ties creating a child-parent relationship * * * with a child * * * may petition the court * * * for an order" providing custody of that child. This requires, first, that the petitioner prove a "child-parent relationship," which is defined as a relationship that existed "within the six months preceding the filing of an action," in which a person having "physical custody of [the] child or residing in the same household" provided food, clothing, shelter, care, education and discipline on a day-to-day basis, fulfilling the child's psychological and physical needs. ORS 109.119(10)(a).

Subsection (2)(a) of the statute interposes protection for the rights of the biological or adoptive parent (*i.e.*, "legal parent") and a consequent hurdle for the petitioning nonparent. That is, "there is a presumption that the legal parent acts in the best interest of the child." Therefore, as a second step, the petitioning nonparent must rebut that presumption. ORS 109.119(3)(a). The presumption may be rebutted "by a preponderance of the evidence" such as that described in the nonexclusive list of factors in ORS 109.119(4)(b):

> "In deciding whether the presumption described in subsection (2)(a) * * * has been rebutted and whether to award custody * * * over the objection of the legal parent, the court

may consider factors including, but not limited to, the following, which may be shown by the evidence:

"(A)   The legal parent is unwilling or unable to care adequately for the child;

"(B)   The petitioner or intervenor is or recently has been the child's primary caretaker;

"(C)   Circumstances detrimental to the child exist if relief is denied;

"(D)   The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or

"(E)   The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."

Emphasizing that the list of factors is nonexclusive and disjunctive, the Supreme Court has observed:

"The statutory touchstone is whether the evidence at trial overcomes the presumption that a legal parent acts in the best interest of the child, not whether the evidence supports one, two, or all five of the nonexclusive factors identified in ORS 109.119(4)(b)."

*O'Donnell-Lamont and Lamont*, 337 Or 86, 108, 91 P3d 721 (2004), *cert den*, 125 S Ct 867 (2005). The factual determinations are for the trial court to make, sitting as the trier of fact. *See id.* at 114 (making findings in *de novo* review). If we do not review *de novo*, then we view the evidence, including all permissible inferences, in the light most favorable to the trial court's conclusion. *Kleinsasser and Lopes*, 265 Or App 195, 198, 333 P3d 1239 (2014). Ultimately, the question of whether the parent's presumption is rebutted is a question of law.

As a third step, the petitioning nonparent must persuade the trial court that the custody award to the nonparent is in the child's best interest. Linking the prior steps, ORS 109.119(3)(a) provides:

"If the court determines that a child-parent relationship exists and if the court determines that the presumption described in subsection (2)(a) of this section has been

rebutted by a preponderance of the evidence, the court shall grant custody * * * to the person having the child-parent relationship, *if to do so is in the best interest of the child.*"

(Emphasis added.) Like other matters of child custody, the best-interest determination is a matter ordinarily committed to the discretion of the trial court. Unless we review *de novo,* our review of the trial court's best-interest determination is for an abuse of discretion. *Kleinsasser,* 265 Or App at 198; *Underwood and Mallory,* 255 Or App 183, 193, 297 P3d 508 (2013). With that deferential standard of review, "we will reverse only if a trial court's discretionary determination is not a legally permissible one." *Sjomeling v. Lasser,* 251 Or App 172, 187, 285 P3d 1116, *rev den,* 353 Or 103 (2012).

B. *Review of This Case*

Mother asks that we review this case *de novo.* We exercise *de novo* review sparingly and only in exceptional circumstances. ORAP 5.40(8)(c). For example, we may do so when the lower court failed to address all of the issues that must be considered, *O'Donnell-Lamont,* 337 Or at 89 (undertaking *de novo* review), or when a court's finding "does not comport with the uncontroverted evidence in the record" and that finding is essential to the court's ultimate conclusion, *Dept. of Human Services v. M. E. (A150359),* 255 Or App 296, 298-99, 297 P3d 17 (2013) (same).

Mother urges *de novo* review for a variety of reasons. In part, they are reasons founded on the preceding dissolution proceedings, and, in part, the reasons question the sufficiency of the evidence. Because we have rejected the challenges to the dissolution proceedings in the first appeal, and because questions of sufficiency do not make this an extraordinary case, we decline to exercise *de novo* review. *See* ORAP 5.40(8)(c) (only exceptional cases). Accordingly, we review for sufficiency of the evidence and legal error the trial court's determination of a child-parent relationship and its determination that the presumption favoring the legal parent was rebutted, while we review for an abuse of discretion the determination of best interest of the child.

## III.  LAW APPLIED

### A.  *Child-Parent Relationship*

Mother disputes each conclusion that the trial court reached, beginning with its initial determination that Southard qualifies as a person with a child-parent relationship with AR. As noted, ORS 109.119(1) and (10)(a) require Southard to have "a child-parent relationship" in the six months before his petition. As a factual matter, mother testified at the hearing that, for more than six months before Southard's present motion and ever since the dissolution judgment the year before, Southard had physical custody and all the makings of a child-parent relationship. Nonetheless, on appeal, mother argues that that period of custody was "unlawful" and should not qualify under ORS 109.119, because she regards the second Southard marriage to be void and the trial court to have lacked authority, as in ordinary dissolution, to have given Southard custody of AR.

For two reasons, we disagree. First, Southard's custody of AR in the preceding year, together with his early years with AR, were not the result of custodial interference. Those times were the result of the years of marriage and a court's custody order in a dissolution judgment. That custody was not "unlawful." Second, we determined in *Southard I* that the Southard marriage was not shown to be void, that the trial court had authority to determine custody, and that the trial court did not err in refusing to set aside that judgment for lack of jurisdiction. 275 Or App at 97-98. Accordingly, the trial court had sufficient evidence and did not commit legal error in finding that Southard and AR enjoyed a child-parent relationship.

### B.  *Rebuttal of Parent's Presumption*

Mother also disputes that the evidence sufficed to rebut the presumption at ORS 109.119(2)(a) that she acts in the best interest of the child. She argues that she provided more than adequate care for the children and that, at the hearing, Southard had acknowledged that mother was a "caring and reasonable" parent. Conceding the first of the five rebuttal factors, Southard responds that sufficient evidence on the second through fifth factors supported the

court's conclusion that he had rebutted the parent's presumption in subsection (2)(a). We look to the evidence before the trial court and its findings in sequence.

The first rebuttal factor considers whether "[t]he legal parent is unwilling or unable to care adequately for the child." ORS 109.119(4)(b)(A). The trial court agreed with mother that Southard had not established the first factor. However, that first finding is not dispositive of the larger issue. In *O'Donnell-Lamont*, the Supreme Court recognized that "nothing in the text of ORS 109.119 * * * suggests that such proof [of a parent being unable or unwilling to adequately care for the child] is required for the nonparent to rebut the presumption that the parent acts in the best interest of the child." 337 Or at 109.

The second factor considers whether the petitioning nonparent "is or recently has been the child's primary caretaker." ORS 109.119(4)(b)(B). The trial court found that Southard had been AR's primary caretaker for the year before the hearing. The court observed that this factor, by itself, did not deserve much weight. Nevertheless, there was no factual dispute that Southard had established this factor.

Predictably, the third factor is hotly disputed and requires more discussion. The third factor considers whether "[c]ircumstances detrimental to the child exist" if Southard were denied custody. ORS 109.119(4)(b)(C). "Circumstances detrimental to the child" "refers to circumstances that pose a serious present risk of psychological, emotional, or physical harm to a child." *O'Donnell-Lamont*, 337 Or at 112; *see also* ORS 109.119(10)(b).

The trial court concluded that Southard established the third factor. The court stressed that the "key factor" in deciding this case

"is the absolute detriment to [AR] if I was to seek—if I was to effectuate [AR] being placed with his mother. I made those findings a year ago, I find her—as not credible as she was a year ago, I found most of what she said to be unbelievable and un-credible. I found her mother's testimony to be not credible. She hasn't learned anything in a year. She is entwined with Mr. Larkins by her own admission,

is a detriment to this child. She testified in June that—in deposition—if faced with the choice between Mr. Southard, who has been this child's primary caretaker for the last year and had a relationship before, and Mr. Larkins, it's in [AR's] best interest to be with Mr. Larkins and not her. That was an extremely telling statement. This is her view. She has enabled and enmeshed with Mr. Larkins to—what I think she believed would effectuate a way for her to have custody of all these children, and she has picked a bad choice."

In her testimony at the hearing, mother conceded that Larkins had been convicted of a crime involving abuse in which she was the victim. A warrant for his arrest was outstanding. She claimed that he lived in Florida out of his car. The court took judicial notice of Larkins' criminal record. The court commented, "I recognize there's a warrant out for [Larkins], and I recognize she's a victim of his crime and she's still standing up for him. That he didn't appear here, I understand why he wouldn't."

The trial court was troubled that mother still was willing to testify that, if faced with the choice of AR being in Southard's custody or Larkins' custody, she would choose Larkins. Of similar import, mother had helped Larkins attempt to intervene in the dissolution for the purpose of being named AR's father. The court observed that mother did not recognize the implication that, if anything happened to her, Larkins would be AR's custodial parent. The court considered mother's continued involvement with an unstable Larkins to present a serious risk of psychological and emotional harm to AR.

As quoted above, the trial court found that mother had not learned anything in the past year from the time of the previous hearing. Mother had lied to Southard and school officials about where she was living in the past year. She did not think it mattered to AR's welfare that Southard, the custodial parent, knew where she was living or where her parenting time was taking place. There was evidence that mother recognized no deficits in her parenting skills and testified instead that her parenting skills have "always been excellent," but there was also evidence that mother often forgets about parenting time or did not use it.

In light of such facts, together with the court's assessment of mother's credibility and judgment, there is sufficient evidence to support the trial court's conclusion that Southard established the third factor concerning circumstances detrimental to the child if Southard's motion were not granted. *See O'Donnell-Lamont*, 337 Or at 113 (concluding that evidence that "father has limited insight, lies whenever it suits him, is insensitive to the children's emotional needs, and would end the children's longstanding child-parent relationship with grandparents" and that "[f]ather was unable to acknowledge or identify a single possible shortcoming that he might have as a parent" established that "father would pose a serious present risk of psychological or emotional harm to the children"); *see also Kleinsasser*, 265 Or App at 207-08 (concluding the same about evidence of mother's disregard for child's relationship with stepmother, mother's open antagonism towards stepmother, and past actions interfering with the relationship showed that mother would not maintain a relationship between the child and stepmother if she had custody).

The fourth factor considers whether mother "has fostered, encouraged or consented to the relationship between the child and [the petitioning nonparent]." ORS 109.119(4)(b)(D). "The factor recognizes that if a parent encouraged or approved of a longstanding pattern of contact or informal custody arrangements involving * * * a psychological parent, then the legal parent, at least at one point, apparently believed that the relationship was beneficial, or at least not detrimental, to the child." *O'Donnell-Lamont*, 337 Or at 115.

In this case, mother caused Southard to act as AR's father, and Southard had acted as father as early as AR's birth. Mother told hospital officials that she was married to Southard, and she was responsible for Southard being listed as father on AR's birth certificate for the first five years of AR's life. Southard lived with AR from 2009 until 2011 when Southard moved out of the home preceding the dissolution filing. AR called Southard "dad" until the time of the parties' separation.

The trial court concluded that Southard had established the fourth factor. Because mother had caused the

relationship between Southard and AR to occur, she had "fostered, encouraged or consented to the relationship." For our part, we conclude that there is sufficient evidence in the record to support the trial court's determination that Southard established the fourth factor. *See Kleinsasser*, 265 Or App at 209-10 (concluding that the trial court did not err in concluding that mother "at least consented" to the relationship between the child and the stepmother when mother trusted the stepmother for years and consented to her as a caregiver, making suspect mother's change of mind about stepmother after discovering father's death).

The fifth and final factor considers whether mother "has unreasonably denied or limited contact between the child and [Southard]." ORS 109.119(4)(b)(E). The factor "focuses on the relationship between the child and a nonparent and, specifically, on the potential harm to a child's interest when a parent terminates or limits such a relationship." *O'Donnell-Lamont*, 337 Or at 116. The court concluded that the final factor also served to rebut the presumption that mother acts in AR's best interest. The trial court took notice of an instance following the Larkins paternity ruling, in which mother told officials at AR's school that Southard was to have no contact with AR. In the Larkins paternity judgment case, the judge refused to make a custody ruling, instead deferring to the custody decision of the dissolution judgment. Despite that limitation, mother attempted to use the paternity ruling to interfere with Southard's custody of AR. Reflecting on the incident, the trial court characterized mother's actions as "mind-boggling." The court observed:

> "[Mother] had a lawyer, I don't know whether she consulted with her lawyer ahead of time, she certainly should have. But the idea that she would go and say, '[Larkins] is now the father,' and he is in Florida, and this little guy had to stay in a room [at school] for 45 minutes before it got sorted out makes my stomach ache."

That incident was not isolated. After the dissolution petition was filed, mother refused to let Southard see AR for eight months. On one occasion, Southard was scheduled to spend time with all three children, but, when Southard arrived at the home, mother told Southard he could not see

AR. After arguing, mother told Southard to wait in his car and that she would send the children out to him. Instead, police arrived to tell Southard that mother did not want him there and that he had to leave.

Mother testified that "I've never had an issue with [Southard] having a relationship with [AR]" and that "some visitation would be okay," but the court found her not credible. Her actions limiting or denying contact between Southard and AR demonstrated her continued intention to limit Southard's contact with AR. Because Southard has had a longstanding, parental role, such interference was harmful to AR's interest. *See Kleinsasser*, 265 Or App at 211 (concluding that the record supported the trial court's finding that the fifth factor had been met when the mother continued to argue for reduced contact with stepmother, was aggressive toward her, and refused to share activities that were important to the child with stepmother, which "demonstrated mother's continuing intention to unreasonably limit stepmother's contact with [the child] in a way that harmed [the child's] interests"); *see also O'Donnell-Lamont*, 337 Or at 116 (concluding that evidence was sufficient where the trial court found that the father's past conduct interfering with the children and grandparents' relationship supported the conclusion that he "will do all he can do to eliminate contact between the children and the [g]randparents"). Again we conclude that the record reflects sufficient evidence for the trial court to conclude that Southard established the fifth factor involving unreasonable interference with contact between the child and the petitioning nonparent.

In all, we conclude that the evidence is legally sufficient to support the trial court's determination that, by a preponderance of the evidence, Southard rebutted the presumption that mother acts in the best interest of AR. *See O'Donnell-Lamont*, 337 Or at 108 ("touchstone is whether the evidence overcomes the presumption, not whether the evidence supports one, two, or all five of the nonexclusive factors"). Mother's conduct, her lack of credibility, her involvement with Larkins, her fostering of Southard's early relationship with AR, and her disregard for Southard's later relationship with AR are sufficient evidence to support the court's conclusion.

C. *Best Interest of the Child*

If the presumption that favors the parent is rebutted, the court makes the ultimate determination whether to grant custody to the person in the child-parent relationship is in the child's best interest. ORS 109.119(1)(a), (3). We review the trial court's conclusion for an abuse of discretion. *Kleinsasser*, 265 Or App at 198. On this record, as it was in *O'Donnell-Lamont* and in *Kleinsasser*, review of that final conclusion calls for review of the same facts involved in rebuttal of the parent's presumption. *O'Donnell-Lamont*, 337 Or at 118; *Kleinsasser*, 265 Or App at 212-13. Given these facts and findings, we conclude that the trial court's determination to continue custody of AR with Southard as a psychological parent was within the range of permissible outcomes. On the final question, the trial court did not abuse its discretion.

## IV.   CONCLUSION

In disposition of competing motions to modify custody of the children or to recognize Southard as AR's psychological parent, the trial court did not err.

Affirmed.