SHORR, J.
*815 Mother appeals a judgment awarding custody of her child, E, to E's paternal grandmother and step-grandfather (grandparents) and awarding substantial parenting time to mother. Mother first assigns error to the trial court's ruling granting grandparents custody of E, contending that the court erroneously concluded that grandparents had established a child-parent relationship with E as defined by ORS 109.119(10)(a). Specifically, mother argues that, because the court did not expressly find the percentage of time that E lived with grandparents before grandparents petitioned for custody, we must either review the record de novo to determine ourselves whether grandparents cared for E on a "day-to-day" basis or remand to the trial court to make that finding expressly. In the alternative, mother asks us to conclude that, even viewing the evidence in the light most favorable to the trial court's disposition, grandparents did not prove a child-parent relationship with E because "day-to-day" care can only be established by showing that E was being cared for by grandparents "every day of the week and every night of the week," and they failed to make such a showing.
Mother also assigns error to the trial court's grant of custody to grandparents on the basis that the court erroneously concluded that grandparents had rebutted the presumption under ORS 109.119(4)(b) that mother acts in E's best interest. Mother argues that the court lacked sufficient evidence to make the factual findings that underpinned that conclusion and erred in weighing the relevant factors under ORS 109.119(4)(b). Both of mother's arguments are unconvincing. Consequently, we affirm.
We turn to the facts. As noted, mother asks us to review the record de novo . We exercise our discretion to review de novo only in exceptional cases and, as we discuss in more length below, decline to do so here. ORAP 5.40(8). Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that *678 outcome." Kleinsasser v. Lopes , 265 Or.App. 195, 198, 333 P.3d 1239 (2014) (internal quotation marks omitted). *816 At the time of trial, E was four years old. He had three older half-brothers and one younger half-sister. His brothers were eight, 10, and 11 years old. His sister was 10 months old.
E's brothers-especially his youngest brother-have severe mental health and behavioral issues. For instance, E's brothers often harm themselves by hitting themselves in the head when they become upset and make statements about wanting to kill themselves. E's brothers' suicidal statements are not empty threats. Approximately a year before trial, E's youngest brother, who was seven at the time, wrapped a belt around his neck in an apparent attempt to hang himself at school. That event resulted in E's brother being hospitalized for approximately a week.
E's brothers often exhibit violent and aggressive behaviors. E's brothers' father described his sons as violent toward each other and noted that their violent behavior has escalated over time. In fact, E's brothers' behavioral issues were so serious that their father, who lives with his girlfriend most of the time, maintains a separate residence for when he has parenting time with his sons because his girlfriend believes that her son had begun "to exhibit anger and emotional issues" similar to those that E's brothers were exhibiting. E's father, who had lived with mother and the older boys off and on, also believes that E's brothers are "much more violent than any children that" he had been exposed to and, as an example, pointed to the fact that E's youngest brother regularly killed lizards.
E's brothers' aggressive behavior did not end at home. E's youngest and eldest brother both have had to be placed on behavior plans at school. While E's eldest brother's plan was terminated prior to trial, his youngest brother's plan was established just one month before trial. That plan included "accommodations and interventions," one of which was a requirement that E's brother start the day in the special education room to "mak[e] sure he comes in happy and off to a good start" and that he participate in "alternative," structured recess, rather than regular recess. That plan was deemed necessary because E's youngest brother's behavior was causing him to be removed from school. For instance, *817 within two months before trial, mother had to miss a meeting regarding E's eldest brother's educational plan because she had to remove E's youngest brother from school because of his behavior instead.
E was born in spring 2011. About a month after E was born, he began living with grandparents. From that point to the point that mother began having him with her for days at a time in September 2014, E spent approximately five to six days a week with grandparents. While E was residing with grandparents, grandparents were responsible for E's care. That care included taking E to dental and doctor appointments, finding E a Head Start program, and providing food and clothes for E. E had his own room, clothes, and toys at grandparents' home, as well as a sandbox and swing set.
In September 2014, mother began taking E for multiple days at a time. During that time, mother would not let grandparents talk to E on the phone while she had him. In response, grandparents filed the current action for custody of E.
A status quo hearing was held in October 2014, where grandparents were granted temporary custody of E. A temporary custody hearing was then held in December 2014, at which mother was awarded temporary custody of E subject to father's parenting time. Mother refused to let father have that parenting time for the first month after that hearing, however, because grandparents, rather than father, picked E up from her home, despite the fact that that was the wish of father.
The custody trial occurred in March 2016. At trial, the custody evaluator appointed by the court, Mazza, testified that he believed that E would likely suffer psychological harm if grandparents were not given custody. As evidence, Mazza pointed to the fact that, between the time that E had begun living with mother and the time that Mazza conducted his evaluation in October 2015, E's behavior had deteriorated and E had begun *679 to exhibit behaviors that Mazza believed were mimicking his brothers-e.g. , hitting himself in the head and saying that he wanted to kill himself. Mazza *818 further testified that, if mother retained custody of E and, as a result, E continued to have significant exposure to his brothers, it was a "likelihood" rather than a "potential" that E would suffer more psychological harm.
Following trial, the court determined that grandparents had a child-parent relationship with E, that grandparents had rebutted the presumption that mother acted in E's best interest, and that E's best interest mandated that grandparents be granted custody of E. As a result, the court entered judgment granting custody to grandparents, subject to mother's substantial parenting time. Mother appeals.
We turn to the law governing a petition for a change of custody over a child pursuant to ORS 109.119. "[A]ny person * * * who has established emotional ties creating a child-parent relationship * * * with a child may petition or file a motion for intervention with the court having jurisdiction over the custody, placement or guardianship of that child, or if no such proceedings are pending, may petition the court for the county in which the child resides" for custody of the child. ORS 109.119(1). To grant custody to the nonparent, the trial court must "determine[ ] that a child-parent relationship exists" and that the presumption that the legal parent acts in the best interest of the child has been rebutted by a preponderance of the evidence. ORS 109.119(3)(a). As noted, on appeal, mother argues that the trial court erroneously concluded that (1) grandparents had a child-parent relationship with E and (2) grandparents rebutted the presumption that mother acts in the best interest of E. We take each of those arguments in turn.
First, mother challenges the trial court's determination that grandparents had a child-parent relationship with E. We review the court's determination of whether a child-parent relationship exists for sufficiency of the evidence and legal error. Southard and Larkins , 275 Or.App. 538, 544, 365 P.3d 1089 (2015), rev den , 359 Or. 39, 370 P.3d 1252 (2016). ORS 109.119 (10)(a) defines a child-parent relationship as
"a relationship that exists or did exist, in whole or in part, within the six months preceding the filing of an action under this section, and in which relationship a person having physical custody of a child or residing in the same *819 household as the child supplied, or otherwise made available to the child, food, clothing, shelter and incidental necessaries and provided the child with necessary care, education and discipline, and which relationship continued on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfilled the child's psychological needs for a parent as well as the child's physical needs."
Here, mother argues that the only element of that definition that grandparents failed to prove is whether they "ha[d] physical custody of" E or "resid[ed] in the same household" as E on a "day-to-day basis."
Mother's argument takes three forms. First, she argues that grandparents failed to present evidence establishing a "day-to-day" relationship because the most favorable evidence in the record is that E spent six out of every seven days with grandparents, and, in mother's opinion, grandparents were required to prove that during a significant period of time E was being cared for by grandparents "every day of the week and every night of the week." Second, mother argues that, even if we were to decide that the fact that E resided with grandparents six out of every seven nights was enough to prove a "day-to-day" basis, we should review the record de novo to determine whether that was actually the case, because the trial court did not make an express ruling on the number of days E spent with grandparents. Finally, mother argues that, even if we do not review the record de novo , we should remand the case to the trial court for further findings regarding how many days of the week E resided with grandparents.
As an initial matter, we find mother's second and third arguments unconvincing. First, we decline to review this case de novo to determine how often E resided with grandparents. As noted, we exercise our discretion *680 to review de novo only in exceptional cases. ORAP 5.40(8). Here, mother offers no reason why this is an "exceptional case" that requires de novo review, and we cannot identify one. Accordingly, as noted, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally *820 sufficient to permit that outcome." Kleinsasser , 265 Or.App. at 198, 333 P.3d 1239 (internal quotation marks omitted).
Similarly, given that standard of review, we decline to remand this case to the trial court to make express findings regarding how often E resided with grandparents because the court impliedly made that finding. As noted, we view the evidence "in the light most favorable to the trial court's disposition." Id. The trial court concluded that E and grandparents had a child-parent relationship. In the absence of any suggestion that the court applied an incorrect test, we must assume that the court found the facts in a manner consistent with that conclusion. Kotler and Winnett , 282 Or.App. 584, 597, 385 P.3d 1200 (2016). If there is evidence in the record to support the court's implied findings, the absence of express findings of fact is irrelevant. Id .
Here, four witnesses presented testimony regarding how many days E resided with grandparents. Grandmother testified that E averaged five days out of six with grandparents. Step-grandfather testified that E averaged six days out of seven with grandparents. An adult grandson of grandparents also testified that, during a four month period that he lived with grandparents, E lived there five to six days a week. Finally, mother testified, based on her own reconstruction of her schedule from mid-July 2014 to mid-September 2014, that E spent approximately 16 out of 60 days, or slightly more than one out of every four days, with grandparents. As we discuss in more detail below, all of that testimony except mother's presents evidence that was "legally sufficient to permit" the trial court's determination. Kleinsasser , 265 Or.App. at 198, 333 P.3d 1239. Accordingly, under our standard of review, we must conclude that the trial court relied on the testimony of grandparents and their grandson indicating that E resided with grandparents approximately five to six days a week during the relevant time period, rather than the testimony of mother, when it determined that E and grandparents had a child-parent relationship under ORS 109.119(10)(a). See Kotler , 282 Or.App. at 597, 385 P.3d 1200 ("We assume that the trial court found the facts in a manner consistent with its ultimate conclusion." (Emphasis omitted.) ).
*821 Our conclusion is also supported by the fact that the trial court expressly did not believe mother's testimony. The court found that "mother [wa]s not credible" and that "her testimony [wa]s not accurate as to the historic things that happened before this case was filed" in October 2014. That is a credibility finding to which we defer. See id . at 597-98, 385 P.3d 1200 (we do not pass on the credibility of witnesses; "as with all conflicting evidence, the probative value of such evidence is solely for the trial court to determine"). Viewed in the proper light, we conclude that the record supports the trial court's implied finding that E resided with grandparents approximately five to six days a week during the relevant time period.
We turn next to mother's contention that the trial court erred because grandparents failed to present legally sufficient evidence that a "day-to-day" relationship existed under ORS 109.119(10)(a). Specifically, mother argues that, to prove that they had a child-parent relationship with E, grandparents were required to establish that E stayed with them "every day of the week and every night of the week." We disagree.
Case law interpreting the phrase "residing in the same household * * * on a day-to-day basis" in ORS 109.119(10)(a) is sparse, and the few cases where we have interpreted that portion of the statute are not helpful here. For instance, in Jensen v. Bevard , 215 Or.App. 215, 225, 168 P.3d 1209, adh'd to on recons. , 217 Or.App. 309, 175 P.3d 518 (2007), a case mother heavily relies on, we held that "[a] nonparent who cares for a child in the nonparent's home on many, but not all, weekends, while the parent is at work, does not reside in the same household as the child on *681 a day-to-day basis for purposes of ORS 109.119(10)(a)." Similarly, in Hanson-Parmer and Parmer , 233 Or.App. 187, 194, 225 P.3d 129 (2010), we held that "two days of parenting time each week * * * is * * * insufficient to establish that husband resided in the same household with [the child] on a day-to-day basis pursuant to ORS 109.119(10)(a)." (Internal quotation marks and brackets omitted.) No case cited by mother or that we could find stands for the proposition that mother advances here: To establish a child-parent relationship, a *822 nonparent must establish that he or she resided with the child every day and night of the week for six months.
Our reasoning in Jensen does provide some guidance, however. In Jensen , we were asked to determine whether a grandmother who cared for her grandchild on most, but not all, weekends resided with her grandchild on a day-to-day basis as that term is contemplated in ORS 109.119(10)(a). 215 Or.App. at 222, 168 P.3d 1209. In answering that question, we undertook a statutory analysis of ORS 109.119 (10)(a), specifically examining the meaning of the phrase "residing in the same household * * * on a day-to-day basis." Id . at 220, 168 P.3d 1209. After determining that the text and context of the statute provided little guidance regarding the legislature's intention, we turned to the legislative history. Id. at 220-22, 168 P.3d 1209. We noted that the legislative history indicated that, when a child stayed with a nonparent three days and three nights a week, that nonparent " 'c[a]me[ ] close to but d[id]n't meet, the day-to-day requirements ' " of ORS 109.119(10)(a). Id. at 224, 168 P.3d 1209 (quoting Tape Recording, Senate Committee on Judiciary, HB 3197, June 2, 1987, Tape 166, Side B (statement of Mark Kramer, committee counsel) (emphasis in Jensen ) ). Consequently, we concluded that the grandmother in Jensen did not reside with her grandchild on a day-to-day basis, in part, because she fell below that three-days-and-three-nights threshold. Id. at 225, 168 P.3d 1209.
In contrast to Jensen , the amount of time grandparents spent with E in this case significantly exceeded the not-quite-sufficient threshold of three days and three nights a week. Construing the evidence in the light most favorable to the trial court's ruling, all evidence other than mother's own not-credible testimony established that E lived with grandparents approximately five or six days a week. Given that the legislative history indicates that living with a child three days and three nights every week "comes close to " meeting the day-to-day requirement of ORS 109.119(10)(a), and the evidence in this case establishes that E resided with grandparents almost twice that often, and nearly every day of the week, we conclude that the evidence was legally sufficient to establish that E resided with grandparents on a "day-to-day" basis as that term is used in ORS 109.119 (10)(a). Accordingly, because the evidence is sufficient to *823 support the trial court's ruling, the court did not err in concluding that grandparents established a child-parent relationship with E.
That leaves us with mother's second argument-that the trial court erred in concluding that grandparents had rebutted the presumption that mother acts in the best interest of E. Like the court's determination that grandparents had a child-parent relationship with E, we review the court's determination that the presumption favoring the legal parent was rebutted for sufficiency of the evidence and legal error. Southard , 275 Or.App. at 544, 365 P.3d 1089. In deciding whether that presumption has been rebutted,
"the court may consider factors including, but not limited to, the following, which may be shown by the evidence:
"(A) The legal parent is unwilling or unable to care adequately for the child;
"(B) The petitioner or intervenor is or recently has been the child's primary caretaker;
"(C) Circumstances detrimental to the child exist if relief is denied;
"(D) The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner or intervenor; or
"(E) The legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor."
*682 ORS 109.119(4)(b). " ORS 109.119(10)(b) clarifies that 'circumstances detrimental to the child includes but is not limited to circumstances that may cause psychological, emotional or physical harm to a child.' " Nguyen and Nguyen , 226 Or.App. 183, 192, 203 P.3d 265, rev. den. , 347 Or. 42, 217 P.3d 688 (2009) (quoting ORS 109.119(10)(b) ).
Further, when determining whether the presumption that the legal parent acts in the best interest of the child has been rebutted, "the court's focus is not on whether one or more of the statutory factors are present, but on whether the evidence as a whole is sufficient to overcome the presumption that the parent acts in the best interest of *824 the child." Kleinsasser , 265 Or.App. at 198, 333 P.3d 1239 (internal quotation marks omitted). Put another way, "[i]n specific cases, the weight to be given to each of the five statutory factors, to the evidence supporting those factors, and to other relevant evidence, will vary." Nguyen , 226 Or.App. at 193, 203 P.3d 265 (internal quotation marks omitted).
Here, mother challenges the trial court's conclusions regarding the second, third, and fifth statutory factors. We take mother's challenge to each of those factors in turn.
First, mother argues that the trial court wrongly found that the second statutory factor-that "[t]he petitioner or intervenor is or recently has been the child's primary caretaker"-evenly supported both parties. ORS 109.119(4)(b)(B). Specifically, mother argues that, because she had been the primary caretaker of E more recently than grandparents, the trial court should find that that factor favors her. We disagree.
The trial court was allowed to make the determination that it did. Our decision in Nguyen is on point. There, we concluded that the second rebuttal factor carried "little weight" for either party because, while the grandparents seeking custody in that case had custody of the child more recently than had the legal parent, the legal parent was the primary caretaker for the child "for the first six years" of the child's life. Nguyen , 226 Or.App. at 195, 203 P.3d 265. Similarly, here, the trial court concluded that the second statutory factor evenly supported both parties where, although mother was E's primary caregiver most recently, grandparents were E's primary caregivers for the majority of E's life prior to their petition for custody. Accordingly, the court did not err in analyzing the second ORS 109.119(4)(b) factor.
Next, mother argues that the trial court incorrectly found in favor of grandparents under the third statutory factor-that "[c]ircumstances detrimental to the child exist if relief is denied." ORS 109.119(4)(b)(C). Specifically, mother argues that the evidence was insufficient to support the court's conclusion that a serious present risk of psychological harm existed if grandparents were not granted custody. Again, we disagree.
*825 The evidence, viewed "in the light most favorable to the trial court's disposition," Kleinsasser , 265 Or.App. at 198, 333 P.3d 1239, supports the court's conclusion that "[c]ircumstances detrimental to the child exist[ed] if relief [wa]s denied," ORS 109.119(4)(b)(C). As noted, circumstances detrimental to the child include, but are not limited to, "circumstances that may cause psychological, emotional or physical harm to a child." ORS 109.119(10)(b). To prove that such circumstances exist, the "nonparent must show that the circumstances of living with the legal parent pose a serious present risk of such harm." Nguyen , 226 Or.App. at 196, 203 P.3d 265 (emphasis in original; internal quotation marks omitted). In other words, "it is not enough to show that living with a legal parent may cause such harm." Id. (emphasis in original).
Here, the trial court found that, if grandparents were not granted custody of E, a serious present risk of psychological harm to E existed from continued contact with his brothers who resided with mother about two-thirds of the time and who had severe mental health and behavioral issues. That finding is supported by sufficient evidence in the record.
Multiple witnesses testified that E's brothers-especially his youngest brother-suffered from severe mental health and behavioral issues. For instance, it is undisputed that E's youngest brother wrapped a belt around his neck in an apparent attempt to *683 hang himself at school approximately a year before trial in this case. Further, multiple witnesses reported that E's brothers would harm themselves when they became upset and often made statements about wanting to kill themselves.
Witnesses also testified that E's brothers had other violent and aggressive behaviors. For example, E's brothers' father noted that his sons are violent toward each other and that their violent behavior has gotten worse over time. Further, their father's longtime girlfriend testified that, although E's brothers' father lives with her most of the time, he maintains a separate residence for when he has custody of his sons because of E's brothers' behavior and because, after spending time with E's brothers, her own son began "to exhibit anger and emotional issues" similar to *826 those that E's brothers were exhibiting. Further, E's father, who had lived with mother and the older boys off and on, testified that E's brothers are "much more violent than any children that" he had been exposed to and, as an example, pointed to the fact that E's youngest brother would regularly kill lizards.
E's brothers' special education teacher, Hill, also testified at length about E's brothers' behavioral issues and their school's interventions to assist them. For instance, Hill reported that, within two months of trial, mother had to miss a meeting regarding an educational plan for E's oldest brother because she had to remove E's youngest brother from school due to a behavioral issue. Further, Hill testified that, a month before trial, E's youngest brother's behavior had become so severe that he was placed on a modified school schedule that included a number of "accommodations and interventions." Those modifications included requiring E's brother to go to the special education room at the start of the day to "mak[e] sure he comes in happy and off to a good start" and participation in "alternative," structured recess, rather than regular recesses. Hill further noted that, since the imposition of those restrictions, E's brother's behavior had been better, but qualified that answer by noting, "It's been recent that we've made all those changes. It's been within the last month."
The trial court also heard evidence that E's continued exposure to those mental health and behavioral issues was currently resulting and would continue to result in psychological harm to E. Mazza, the custody evaluator, testified that he believed that E was already being harmed by exposure to his brothers' behavior. He noted that E has "acted out" in response to time spent with his brothers. He also noted that E "has been displaying some unsafe behaviors," such as hitting himself in his head and saying that he wants to kill himself, which Mazza believed E was doing to imitate his older brothers. Further, Mazza testified that, if mother retained custody of E and, as a result, E continued to have significant exposure to his brothers, it was a "likelihood" rather than a "potential" that E would suffer more psychological harm.
*827 Mother argues that the evidence cited above is not sufficient to support the trial court's conclusion because, given other evidence in the record, it does not show that there was a serious present risk of harm to E if grandparents were not awarded custody. Specifically, mother argues that the above listed evidence is dated and outweighed by evidence that E's brothers' behavior had improved before trial. We disagree.
As mother points out, the most convincing testimony that E's brothers' behavior had improved before trial came from E's youngest brother's skills trainer, Buckley; E's youngest brother's therapist, Pence; and the childcare provider that mother had hired, Thompson. The trial court determined, as it was entitled and obligated to as factfinder, that that evidence was unpersuasive in light of competing evidence. See Kotler , 282 Or.App. at 593-94, 385 P.3d 1200 ("We acknowledge that the trial court, as trier of fact, was entitled to accept husband's evidence * * * and reject wife's contrary evidence. Indeed, it was the court's obligation to weigh the evidence and to determine whose evidence it found more persuasive." (Internal citations omitted.) ).
Although Buckley, Pence, and Thompson reported improvements in E's brothers' behavior, that evidence was contradicted by the testimony of Hill, the special education teacher, *684 who reported that E's youngest brother had to be placed on a new behavioral management plan a month before trial and had to be removed from school at least once in the two months preceding trial, and E's brothers' father, who reported that his sons' behavior had only gotten worse over time. Further, the testimony of Buckley and Pence-both of whom worked with E's youngest brother exclusively-revealed that they were not working with a complete picture of E's brother's mental health and behavioral issues. Buckley was not aware that E's brother had previously attempted suicide, and Pence, a therapist whose focus was improving E's brother's behavior at school, was not aware that E's brother had been removed from school in the two months preceding trial. Given that there is evidence to support the trial court's decision, and the court was entitled to disregard some evidence of recent improvement in E's brothers' *828 behavior in light of contradictory evidence, the court did not err in concluding that circumstances detrimental to E existed if custody was not granted to grandparents.
Finally, mother argues that the trial court incorrectly concluded that the fifth prong-"[t]he legal parent has unreasonably denied or limited contact between the child and the petitioner or intervenor"-weighed in favor of grandparents. ORS 109.119(4)(b)(E). Specifically, mother argues that "there simply is no evidence to support the court's finding on th[at] factor." Once again, we conclude that sufficient evidence supports the trial court's conclusion. Grandfather noted that, for a month after mother was initially granted temporary custody, mother refused to let grandparents take E during father's parenting time when father was not physically present to pick E up, despite the fact that father approved of E spending that time with grandparents. That evidence was undisputed at trial. Consequently, the record is sufficient to support the trial court's finding on that factor.
Accordingly, because the trial court's findings under the ORS 109.119(4)(b) factors were supported by sufficient evidence and the court did not legally err in applying those factors, the trial court did not err in determining that grandparents rebutted the presumption that mother acts in the best interest of E.
Affirmed.